**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
Southern Division**

BEN WETMORE,

and

VICTORY STRATEGIES, LLC,

       Plaintiffs,

   v.

ADAM HEATH BRASSFIELD
    **Serve:**
    **236 County Road 4421**
    **Poplar Bluff, MO 63901**

and

VERONICA BRASSFIELD
    **Serve:**
    **236 County Road 4421**
    **Poplar Bluff, MO 63901**

and

ADAM BRASSFIELD, INC.
    **Serve:**
    **236 County Road 4421**
    **Poplar Bluff, MO 63901**

and

BRASS21 PRODUCTIONS, LLC
    **Serve:**
    **236 County Road 4421**
    **Poplar Bluff, MO 63901**

       Defendants.

Case No.:

**<u>JURY TRIAL DEMANDED</u>**

## COMPLAINT FOR DAMAGES
## PURSUANT TO MISSOURI AND FEDERAL LAW

COMES NOW Plaintiffs BEN WETMORE ("Wetmore" or "Ben") and VICTORY STRATEGIES, LLC ("Victory"), and for their causes of action for libel, injurious falsehood, and interference with a business relationship and/or expectancy, pursuant to Missouri law, as well as violations of the Lanham Act, 1505 U.S.C. § 1051, et seq., respectively, against Defendants ADAM HEATH BRASSFIELD ("Brassfield"), VERONICA BRASSFIELD ("Veronica"), ADAM BRASSFIELD, INC. ("Company 1"), BRASS21 PRODUCTIONS, LLC ("Company 2") (collectively, "Defendants"), state to the Court as follows:

1.      Plaintiff Ben Wetmore is a lawyer and former legislative aide for State Representative Matt Maddock ("Matt") in Michigan.  Plaintiff also owns a political consulting firm, Plaintiff Victory Strategies, LLC, that manages political campaigns.  At all times relevant hereto, Plaintiffs Wetmore and Victory were residents of the State of Michigan.

2.      Upon information and belief, Defendant Adam Brassfield is a political campaign manager who is and was at all relevant times, a Missouri citizen, residing at 236 County Road 4421, Poplar Bluff, Missouri 63901, and who co-owned and co-operated Defendant Companies 1 & 2 (and possibly other corporate entities) in conjunction with Defendant Veronica Brassfield.  At all relevant times, Defendant Adam Brassfield conspired with each Defendant and also unnamed third-party entities and individuals to commit the wrongful conduct described herein.

3.      Upon information and belief, Defendant Adam Brassfield, Inc. is a Missouri business with its principal place of business in Missouri.  Defendant Brass21 Productions, LLC is a Missouri Limited Liability Company which is and at all times relevant hereto was a Missouri citizen.  At all relevant times, Defendant Companies 1 & 2 conspired with each Defendant and

2

also unnamed third-party entities and individuals to commit the wrongful conduct described herein.

4.     Upon information and belief, Defendant Veronica Brassfield is a Missouri citizen and at all relevant times hereto co-owned and co-managed Adam Brassfield, Inc., Brass21 Productions, LLC, and potentially other corporate entities along with Defendant Adam Brassfield. Further, Veronica Brassfield also conspired with all other Defendants to defame all Plaintiffs as more fully stated, *infra*, including but not limited to contributing to the drafting and scripting of Defendants' video and other publications on social media, among other activities.  At all relevant times, Defendant Veronica Brassfield conspired with each Defendant and also unnamed third-party entities and individuals to commit the wrongful conduct described herein.

5.     This is an action for libel, injurious falsehood, interference with business relationships and expectancies, and violations of the Lanham Act, 1505 U.S.C. § 1051, et seq, pursuant to Missouri and Federal law, respectively. This Court has jurisdiction pursuant to 28 U.S.C. § 1391(b)(1), 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1332(a), 28 U.S.C. § 1338(b), and 28 U.S.C. § 1367.  The venue in this case is appropriate pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of Butler County, Missouri; and 28 U.S.C. § 1391(b)(2), because a substantial portion of the events or omissions giving rise to the claims occurred in this district.  The case involves a series of videos and other publications that Defendants conspired with others to publish and in fact did publish on the internet, of and concerning Plaintiffs, which name and harm **all** Plaintiffs, presenting common questions of law and fact as more fully described in this suit, considered as a whole.  Plaintiffs seek injunctive and monetary relief.

## **FACTS APPLICABLE TO ALL COUNTS**

6.      Plaintiff Ben Wetmore is a former legislative aide to Michigan State Representative Matt Maddock, and operates a political consulting company in Michigan.  Ben also advises Meshawn Maddock ("Meshawn"), former co-chair of the Michigan Republican Party, and regularly provides advice to campaigns as a political consultant.  Prior to this, Ben worked across the country as a political consultant in various capacities for issue and candidate campaigns and organizations for the past 20 years.  During that time, Ben trained thousands of college students and citizens in over forty states in political organization, writing, campaign management, journalism, and media messaging and management.  Ben is also a lawyer.  Ben provides his consulting services to clients across the country, and has previously advised campaigns in Missouri, Texas, South Dakota, Michigan, Washington, D.C., and other places.

7.      Ben owns Plaintiff Victory Strategies, LLC, and it is through this business that he markets and performs his political consulting services.

8.      Defendants are political consultants and consultancies based in Butler County, Missouri.

9.      In 2021, Defendants managed multiple political campaigns in Michigan.

10.      During the summer of 2021, Defendants had a falling-out with one of these candidates, Jon Rocha ("Rocha"), and Defendants thereafter ceased managing the candidate's campaign.

11.      In October of 2021, Defendants managed the campaign of another candidate, Audra Johnson ("Johnson").  Johnson sought to run for a seat in the 3rd Michigan Congressional District. Johnson also sought the endorsement of former President Donald Trump in that district.  However, President Trump preferred a stronger candidate for that race and declined to endorse Johnson.

12.     Despite this, President Trump expressed to Meshawn that he valued good candidates, and offered to consider supporting candidates like Johnson, who dropped out in favor of stronger candidates, if she were to run for a seat in any different race.  In such instance, President Trump would consider an endorsement for her there.

13.     Meshawn communicated this to Johnson in mid to late October, 2021.  Similarly, at Meshawn's request, Ben contacted Defendant Adam Brassfield on or about the same date, and communicated the same information.  During that phone call, Adam Brassfield indicated he and Johnson would need some time to consider the matter.

14.     Through their representative, Adam Brassfield, Defendants discussed the matter described in paragraphs 11 and 12 above during a telephone call occurring sometime on or before November 15, 2021.  This call consisted of Ben, Meshawn, Johnson, and Adam Brassfield.  Brassfield recorded the phone call.

## DEFENDANTS BEGIN DEFAMING PLAINTIFFS

15.     Defendants began their defamation of Plaintiffs in November, 2021, and Continuing such conduct into 2022.

16.     During this time, Defendants published a letter on social media alleging that the Michigan GOP was operating a 'pay to play' scheme in which President Trump would issue an endorsement in exchange for a thirty-thousand-dollar ($30,000) kickback to Meshawn and/or the Michigan Republican Party from the respective candidate.  *See* **Exhibit 1**, attached and incorporated as though fully restated and set-forth herein.  In a series of Facebook communications, Defendants alleged that Ben Wetmore was orchestrating a pay-to-play scheme in Michigan.[1]  These statements were objectively and provably false, and defamatory.

---

[1] Defendants, through their representative Adam Brassfield confirmed this during a Facebook Live Video publication posted on November 28, 2021. ("Who would have thought at a one and a half page to two page letter that I penned

17.     Thereafter, through their spokesperson, Adam Brassfield, Defendants began publishing videos,[2] articles, tweets and comments variously either altering their original allegations or expanding said allegations, *repeatedly encouraging their audience to share the defamatory statements*, and making the following direct or implicit factual allegations:[3]

a.  that Plaintiffs were either part of or the leader of a 'pay-to-play' scheme exchanging endorsements from President Trump for a $30,000 kickback from the respective endorsed candidate (**no such scheme ever existed**);

b.  that Ben is an extortionist (**Ben has not extorted anything from anyone**);

c.  that Ben engaged in illegal conduct by operating a pay-to-play scheme (**there was no pay to play scheme**);

d.  that Ben engaged in a criminal conspiracy (**there was no criminal conspiracy**);

e.  that Defendants have proof of a pay-to-play scheme operated by Ben (**Defendants have no such proof**);

f.  that one or more of Ben's actions were fraudulent (**Ben has not committed fraud**);

g.  that Ben mismanaged Meshawn's campaign funds (**Ben does not now, and never has managed Meshawn's campaign funds**);

h.  that Ben was involved in, or the leader of, a bribery scheme (**there was no bribery scheme**);

---

and put on social media would have set Michigan completely on fire.  I feel like I'm special.  You know what I mean?
… And so tonight, I'm gonna, I had this whole video production set up.  I had my team come in, we were going to it together, and I said, fuck that.  I'm just going to tell the truth, and put it out there.  And, if anybody doesn't like it, you know how to get a hold of me.  And I would gladly see you in court.  Because, I am not afraid to put my hand on a Bible under oath…").

[2] Each video was broadcast from Brassfield's home in Butler County, Missouri.

[3] The reason these statements are false can be found in each accompanying parenthetical phrase.

i.   that Ben is an unethical henchman for Meshawn and Matt Maddock, who in turn run one of the most corrupt organizations in the United States (**there is no evidence of unethical behavior and Ben does not work for Meshawn**);

j.   that, as a henchman of Meshawn, Ben is threatening bodily harm or other injury to Defendants or others (**Ben threatened no one**);

k.   that Ben is a pathological liar (**Ben is not a pathological liar**);

l.   that Plaintiffs are liars (**Plaintiffs are neither dishonest nor liars**);

m.   that Ben and Victory are completely incompetent in their stated professions and areas of expertise (**Ben, as President of Victory, has over 20 years of political experience**);

n.   that Plaintiffs have no experience in politics or in managing political campaigns (**Ben, as President of Victory, has over 20 years of political and campaign experience**);

o.   that Ben is a felon (**Ben is not a felon**);

p.   that Ben embezzled funds from multiple non-profit entities in Texas (**Ben did not embezzle money from anyone, ever**);

q.   that some governmental entity forced Plaintiffs to leave Texas (**this is false**);

r.   that Defendants possess between two (2), five (5), or seven (7) affidavits proving that Plaintiffs broke Michigan law (**Defendants do not possess these documents**);

s.   that Defendants are unwilling to publish said affidavits because the respective affiants are in physical danger, their jobs were at risk, their homes were at risk, or a combination of all three (**Defendants have created these concepts out of thin air**);

7

t.  that these affiants are in fear for their lives (**this is a fantastical falsehood with no basis in reality**);

u.  that Defendants have a responsibility to protect the identities of the affiants due to the physical danger facing these affiants (**this too, is a fantastical falsehood with no basis in reality**);

v.  that Defendants have enormous, additional hidden, undisclosed evidence (**this is a blatant lie**);

w.  that three quarters of the evidence in Defendants' possession has not yet been released (**this is false – there is no secret evidence because there Plaintiffs committed no wrong**);

x.  that Defendants will not publish this evidence unless subpoenaed by the Michigan legislature (**this is false**);

y.  that Defendants will not provide testimony to the Michigan legislature without a "security detail" present to protect them (**again, this is an extraordinary lie because it assumes that Defendants have been threatened with violence, which is also a lie**);

z.  that Defendants will not publish this evidence unless pulled into a court of law (**this is a lie, because there is no such evidence**);

aa. that Defendants are in physical danger because of they uncovered Plaintiffs' corruption (**this is false: there is no danger, and there is and was no corruption**);

bb. that Defendants' have stored this undisclosed evidence in five separate locations with five different people in the event of their mysterious deaths or disappearances (**this is a complete fabrication**);

cc. that Plaintiffs' criminal activity is directly analogous to the crimes committed by former Illinois governor Rod Blagojevich, for which the latter was convicted and sentenced to prison (**Plaintiffs committed no crimes, and this is false**);

dd. that the "evidence" published by Defendants, including a selectively edited audio clip and ambiguous text messages prove that Plaintiffs engaged in a bribery scheme (**whatever text messages may be touted as "evidence", there is no evidence of Plaintiffs engaging in unethical or illegal conduct**);

ee. that Plaintiffs' denials of wrongdoing were further proof of wrongdoing (**this is a lie**);

ff. that Defendants understand Michigan law, and that their audience can trust that Plaintiffs violated Michigan law on that basis (**Defendants have not the slightest understanding of any aspect of law – in Michigan or otherwise -  and this is a deliberate lie to confuse the public and Plaintiffs' customers** );

gg. that Defendants consulted with one or more lawyers about Michigan law, and that their audience can trust that Plaintiffs violated Michigan law on the basis of that authority (**given that Defendants' interpretation of law is completely inaccurate, and that Plaintiffs have committed no wrongdoing, this is a clear falsehood**);

hh. that Plaintiffs' clients and prospective clients cannot trust Plaintiffs because they regularly violate Michigan laws, including campaign laws (**Plaintiffs have violated no law, and this allegation is false**);

ii. that Plaintiffs' clients should terminate their relationships with Plaintiffs because Plaintiffs engage in criminal, unlawful, or unethical behavior (**Plaintiffs have

**violated no law, and this allegation is a clear falsehood and material misrepresentation)**;

jj. that Plaintiffs' clients and prospective clients cannot trust Plaintiffs because Plaintiffs will coerce and extort money or other concessions (**Plaintiffs have violated no law, and have not extorted anything from anyone, and this allegation is a clear falsehood and material misrepresentation)**;

kk. that Plaintiffs' clients and prospective clients should hire Defendants (**the assumptions built into this statement make it both false and wrongful under the Lanham Act**);

ll. that by hiring Plaintiffs, Plaintiffs' clients may be criminally liable for the crimes committed by Plaintiffs (**Plaintiffs violated no laws and the suggestion that they or their clients are criminally liable for anything is a lie**);

mm. that Defendants have paid spies in Michigan who will discover the criminal wrongdoing of Plaintiffs and their clients (**despite the intrinsic lunacy of this statement, this statement is false and designed to and has maligned Plaintiffs**);

nn. that if Plaintiffs' clients and prospective clients refuse to provide affidavit testimony exposing Plaintiffs' unlawful activities, Defendants will expose said clients (**despite the intrinsic lunacy of this statement, this statement is false and designed to and has maligned Plaintiffs**);

oo. that Plaintiffs assist Matt and Meshawn Maddock in soliciting voter donations on false pretenses (**this is an allegation of fraud; Plaintiffs have committed no fraud and have not misrepresented anything to any donors**);

pp. that this money must be returned to the donors because it was fraudulently obtained (**the insinuation that any money was solicited or received under false pretenses is a grotesque and malicious lie**);

qq. that Plaintiffs cannot be trusted (**this is false**);

rr. that Plaintiffs have committed financial malfeasance (**Plaintiffs have not committed malfeasance, financial or otherwise**);

ss. that Plaintiffs have deceived the public through phony Trump endorsements (**the endorsements were/are real**);

tt. that Defendants have sent critical evidence of Plaintiffs' wrongdoing to unstated governmental entities (**this is false, because Plaintiffs have done nothing wrong**);

uu. that Defendants have been summoned by some governmental authority regarding their allegations against Plaintiffs, and that Plaintiffs will likely be investigated by some form of government tribunal (**this is false, because Plaintiffs have done nothing wrong**);

vv. that Plaintiffs regularly recruit convicted felons to become candidates and then receive payment to manage their campaigns (**this is false**);

ww.  that Plaintiffs are cowards (**this is false**);

xx. that Defendants won't "back down" from their comments, and are committed to destroying Plaintiffs (**this falsely implies that Plaintiffs have committed a crime or breach of ethics**);

yy. that Plaintiffs violated Michigan Supreme Court case law and rules prohibiting legislative employees from engaging in political activities during the workday (**this is categorically false**);

zz. that Plaintiffs conducted campaign work using Michigan state resources (**this is categorically false**);

aaa.  that as a result of conducting campaign work using Michigan state resources, Plaintiffs may have committed felonies (**this is false; Plaintiffs have not committed any crimes**);

bbb.  that Plaintiffs are completely corrupt (**this is false**).

18.    Further, Defendants repeatedly encouraged their audience to widely share and disseminate the defamatory statements.  These statements are pled *verbatim* in paragraph 20, *infra*; they are also assembled in a spreadsheet within **Exhibit 2**, attached hereto and incorporated as though fully restated and set-forth, herein.

19.    In these defamatory publications,  Defendants claimed to have secret evidence, including but not limited to between two (2), five (5), or seven (7) secret affidavits in the possession of their "attorney," and a secret witness, each of which they would release/reveal after the election, but that those cynics pressing him to reveal the information sooner were invited to "pull [Defendants] into a courtroom before the election is over … pull me into a court in front of a judge." Published on Facebook Live Video on November 28, 2021; *see* ¶ 20(b), *infra*.

20.    **Defamatory Statements**.

a.    *See* **Exhibit 1**, incorporated as though restated and fully set forth, herein.  This is a public letter that Defendants published on Facebook, on or about November, 2021.

   i.    Critically, the letter alleged that that the leadership of the Michigan Republican party and their staff were brokering endorsements from former President Trump to Michigan political candidates, in exchange for payments of $30,000:

   *"We need 'America First' candidates not 'Me First' candidates. I believe at one time Mr. Rocha's heart was in the right place, but when you surround yourself with the most corrupt organization in Michigan called the MIGOP, evil tends to start wearing on you. When you have to 'funnel' $30,000 to*

*receive an endorsement and not have it based on your own merit, you then become the establishment. I have seen this happen many times to new candidates. Some people just can't handle the spotlight."*

b. <u>Secret Evidence Not Shared with Audience. Published November 28, 2021 via Facebook Live Video</u>.

*"I have five affidavits.  Me and my attorney.  You know what an affidavit is -that's somebody [sic] who gives a statement under oath and signs a piece of paper.  And then I have a witness to **everything that I wrote in the letter**."*

\*\*\*

*"[to force Defendants to produce the secret evidence] I suggest you pull me into a courtroom before the election is over.  Because remember what I said in the letter was I'd never intended to go public with this information until after the election.  But if you want to be Mr. Badass, and you would like to pull me ... into court in front of a judge, I will be more than happy to put my hand on the bible and tell the truth."*

\*\*\*

*"If you want me to show you the paperwork, please God, sue me to the moon and back, put me in a Michigan courtroom. ... Now all of you telling me that I have to be the one to show the proof.  No, I don't.  I made the allegation.  I made the allegation."*

\*\*\*

*"And then all you people who say, 'oh well, Adam don't have anything.  You're going to wish you didn't.  Because I have way, way, way more than just this.*

\*\*\*

*"Problem is, I write-down everything.  I record everything.  If you don't believe me, then I challenge you to put me in a courtroom.  Just do it.  Do it before my lawsuit comes in at the end of next August.  Because I guarantee you, when that happens, it'll happen in the State of Missouri.  Put me in a courtroom in the State of Michigan.*

\*\*\*

*"If you press me further, I'm going to start releasing audio, and I'm going to start releasing every single piece of information.*

\*\*\*

*"[asked why Defendants cannot release all of their evidence] There is certain information right now that we can't release because there are people that are in fear of their life, really, in Michigan. They're in fear of losing their job. They've been threatened with losing their job. They've been threatened with losing their homes. They've been threatened outside the – and this is what's … So, these people are afraid. They're afraid to come out, but um, they don't want to come out in public, but they will in a courtroom. So a subpoena makes people…"*

\*\*\*

*"What I released tonight is just an eighth of what I can release. An eighth! Seriously.*

\*\*\*

*"The people who should be worried are the people who are involved with Meshawn and Matt and Ben. They should be super worried. Because they can't do anything to me. This information that I have is in five different locations with five different people. Right? So anything happens to me or my family – and number one, I'm not suicidal. Number two, anything happens to me, it automatically gets released."*

\*\*\*

*"Yeah, there's a lot of people that are in danger in Michigan, and I've got to make sure that I protect them."*

\*\*\*

*"I've got all the recordings. Audra has all the recordings. Pay for play is happening in MI-GOP, and I'm about to set the whole damned state on fire."*

c. <u>Proof of a pay-to-play scheme. Published November 28, 2021, via Facebook Live Video.</u>

*"And you say, 'where is the proof of a paid endorsement?' [Chortle], I got that, too."*

\*\*\*

*"Ben Wetmore, I have all of the audio me and Audra are working on that together."*

d. <u>Ben's participation in the alleged pay-to-play scheme; claims that phone recording proves this. Published November 28, 2021, via Facebook Live Video.</u>

14

*"I want to talk about a guy that I did have a conversation with – me and Audra [Johnson] recorded it. This moron. See, bait and switch is so big. And so easy. And a lot of people don't understand politics, how to use it. But I've been using it for nearly 20 years. But, Meshawn Maddox, Maddock, whatever you want to call her, and her husband Matt. Their attorney and political nightmare is Ben Wetmore. Now, after I had that call. Remember what I just said a few weeks ago. Six weeks ago, or a few weeks ago, four weeks ago, whatever was when Meshawn called me. And then, literally before I could get off the top of the hill where I have no signal, I had to go to the top of the hill to call Audra [Johnson]. John Smith calls me and asks me about Gibbs. And I knew right then what was going on. I fed him a little bit of a line. And I fed him a little more. Then I got another phone call from somebody I won't disclose, fed them a little bit more. Then, I talked to Ben [Wetmore]. Do all of you guys remember Rod Blagojevich? He was the governor of Illinois that went to prison for 15 years. And at the end of his 15 years, Trump commuted his sentence so that he could get out. He was accused of pay-to-play. Well, in Michigan, it's not against the law. And it's very much legal. You can ask Tom Norton, that every time you have a conversation, you can record it without announcing it to the person on the other end of the line. So, obviously, when Meshawn's calling me – she's corrupt – and then Ben's calling me – works for Victory [Strategies] – and I'm going to tell you about that here in a second, too. I'm recording. She's recording. I told Audra, let's record this. Ben Wetmore calls me and we're trying to figure out , now that Meshawn is on the phone with me and Audra, and we're trying to figure out where we're going to place Audra in the state. Well, obviously, you know, Audra is from Grand Rapids. So she would have already – her and her husband Jeff were going to buy a house, already, in that location, near there. So, Ben starts to talk to me about this district. And I believe his name is Braun who cannot run again for state rep. And I, you can hear me specifically say, 'So you're telling me, Ben, that if I have my candidate run in the seat that Braun is running in that number one, I'm guaranteed a trump endorsement. And, number two, I am guaranteed a max donation from the Maddox family, from Meshawn and her husband. And he, without hesitation says, yes. That's called pay-to-play. And that is illegal. Ask Rod Blagojevich. I didn't know that I knew Ben Wetmore. ...*

\*\*\*

*"A minute ago I told you Ben ... Wetmore ... when I had my conversation with him, these were the things that I obviously recorded. And it all went through. But I asked him point blank – 'So, you're telling me that if Audra drops out of the race and runs [for a different seat] that Donald Trump has said he will endorse her guaranteed for anything she wants to run for in Michigan?' He said yes. And then I asked, 'and that means also the support of Meshawn and her husband and a max donation?' He said yes. You see, this is where these morons don't understand that I've been doing this for 20 years, and I set them all up. I mean, I can't believe they even fell for it. ... I've also heard that they sent me cease and desist letters. And*

15

*nobody sent me no damned cease and desist.  You know what I would do with a cease and desist letter? Id' wipe my ass with it."*

e.  <u>Accusation that Ben has threatened harm – bodily or otherwise – against Defendants.  Published on November 28, 2021 Facebook Live Video.</u>

*"Last thing I'm going to say.  Every conversation that I've had with Meshawn and Ben, I have – I'm not afraid of none of you punks.  And I'm calling right now for the resignation of Meshawn Maddock.  From the MIGOP.  You are and have led one of the most corrupt organizations in the United States of America.*

\*\*\*

*"[asked why Defendants cannot release all of their evidence] There is certain information right now that we can't release because there are people that are in fear of their life, really, in Michigan.  They're in fear of losing their job.  They've been threatened with losing their job.  They've been threatened with losing their homes.  They've been threatened outside the – and this is what's … So, these people are afraid. They're afraid to come out, but um, they don't want to come out in public, but they will in a courtroom.  So a subpoena makes people…"*

\*\*\*

*"The people who should be worried are the people who are involved with Meshawn and Matt and Ben.  They should be super worried.  Because they can't do anything to me.  This information that I have is in five different locations with five different people.  Right?  So anything happens to me or my family – and number one, I'm not suicidal.  Number two, anything happens to me, it automatically gets released."*

\*\*\*

*"Yeah, there's a lot of people that are in danger in Michigan, and I've got to make sure that I protect them."*

f.  <u>Defendants encouraging audience to share the defamatory statements.  Published during the November 28, 2021 Facebook Live Video.</u>

*"So I'm asking all of you Michigan people to share this…"*

\*\*\*

*"Hey, share this all over the place in Michigan…this will surely light the world on fire."*

\*\*\*

*"Share all this.  Let's grow the audience.  Fuck it."*

\*\*\*

*"Let's get Michigan numbers up.  Come on, share it.  Let's get them up.  Post it. Share it.  Post it in Michigan, all over Michigan.  Let's go boom, boom, boom, boom, boom, boom, boom.  Let's get rid of corruption.*

g.  <u>Allegations of pay-to-play illegal campaign actions and corruption.  Published on December 1, 2021, via Facebook Live Video.</u>

*"Now think about this for a second, if what I have been saying, and what I said the other night on my [Facebook] live wasn't the truth, then why is all of Michigan's hair on fire at the MI-GOP?  I mean, even Ben [Wetmore] has now come out.  He's got to respond to some of my comments or my videos…"*

\*\*\*

*"So, when I use the term 'pay for play,' it's often used in the same sentence as quid pro quo.  Or, in other words, you do something for me, and politically, I'll do something for you.  Now the pay for play is illegal as hell.  Quid pro quo is unethical as hell.  But's hard to be proven.  I have proven everything that I need to prove. I've given you text messages.  I've let you listen to some audio – not all.  Trust me. But if you think this is all the evidence I got, you have lost your mind.  I want all Michigan to wake up and realize that you're being played like a fool."*

\*\*\*

*"My papa was a smart man.  He always said that the guiltiest dog barks loudest … and oh my god, has the MI-GOP started barkin.'"*

\*\*\*

*"She [Meshawn Maddock] needs [candidate] Mike Detmer.  She needs [candidate] John Rocha.  She needs [candidate] Angela Rigas.  She needs all these people they're putting in places for these penned endorsements that they actually write because she needs the speaker of the house [for her husband, Rep. Matt Maddock]. Why? Because if 2024 goes down like 2020, guess who is going to be in charge of the investigation [of illegal conduct by Meshawn and her staff, including Plaintiffs].*

h.  <u>Allegations That as a Result of Defendants' Defamatory Statements, 20-30 candidates have asked Defendants to manage their campaigns.  Direct Effort to</u>

<u>Interfere with Plaintiffs' Client Relationships.   Accusations that Plaintiffs Threatened People.  Published on December 1, 2021 via Facebook Live Video.</u>

*"Since my [Facebook] Live, my last one, I have probably had 20 to 30 – I have to look and see – but it's going on 30, at least 25 candidates in Michigan that have messaged me and asked me to hire for your race, your state race.  ... I had a conversation with my entire team.  ... And so here's what I'm doing.  If you're running for state office in the state of Michigan – and Ben [fumbling his surname] Wetmore or whatever the hell his last name is, has got you under his thumb and machine have got you got you under their thumb, and you want out ... I am making myself and my team available to help you with your campaign if you really want to win. Because I'm going to tell you right now, and I'm going to prove to you real quick, why you cannot win with Meshawn and why you cannot win with Ben.  ... But I have a full team and staff that are ready to help you win in Michigan, and you don't have to be afraid.  Because 20 out of the 25 people who've messaged me are like, 'oh my God, I've got to have the Trump endorsement or I can't win.'*

***

*Too many people are lying through their teeth for political gain.  If you are a political candidate for state office in Michigan, and you want somebody to really represent you, send Audra a message of send me a message.  We will work the details out.  I've got a team put together and over the last 24 hours that's ready to help you win.  And here's what I can tell you.  ... I got they got their thumbs on you making you think that unless you do it their way there is no way.  That's bullshit. ... and then we started to see the corruption inside the MI-GOP.  We set them up with a phone call.  We recorded it.  We set them up with text messages.  I shared them.  All is legal in the state of Michigan.  I'm not afraid of anything or anybody. But now, they're starting to threaten other people.  ...* ***So if you're a candidate running in Michigan, and you want some serious help, and my suggestion is to you, you don't have to bring me into the mix.  Fire, fire Ben! And get rid of him. Find somebody who is going to really help you.*** *That's not going to hold over your checks in his office, or your fundraiser, in his office. And that is not going to circle-jerk for Matt Maddock to become Speaker of the House.  That's the last thing you want.*

***

"You don't have to be afraid of [Meshawn Maddock's] minions and all these idiots. Hey, do I look scared? … If Ben gets Matt Maddock … into Speaker of the House, that'll be [Ben's] his biggest accomplishment.  His first candidate that he ever ran and is running, I guess, and I'm not speaking for her because I do not know her, is Melissa Carone.  And I feel sorry for her because she's being targeted left and right. Just like Audra is being targeted.  And the cool thing is, that they're all coming after me now."

   i.   <u>Direct allegations that Plaintiffs have no experience as campaign managers and offer grossly inferior and highly dishonorable and incompetent campaign consulting and management; allegations of threats.  Published on December 1, 2021 via Facebook Live Video.</u>

*"First of all, Ben Wetmore, his very first candidate he's ever ran, that I understand, is Melissa Carone.  I don't know Melissa.  So, I may be wrong about this – Melissa correct me.  But, his very first candidate that he has ever run ever.  He doesn't have any experience, he's an attorney.  His number one job is to make sure that he circle jerks Matt Maddock, and all the people running for office are in the right place so that Matt can become Speaker of the House in Michigan.  That is his number one job.  He's a circle jerker.  That's it.  He doesn't know anything about writing strategy.  As a matter of fact, he works for a company called Victory Strategies.  And it just dawned on me the other day, who Victory was.  Well, in Missouri, a few years ago, we had a big senate race.  And there was a guy who was in the senate race, his name was Jeff Shawn.  And he was represented by Victory.  And he was the current sitting state rep that was termed-out and he was running for state senate.  Well, come to find out, you go back in my videos, you can look at me in this hat.  And you can found out real quick I found out everything I needed to know about him.  Victory has a tendency to represent people that will, in this person's case, he committed appraisal fraud.  And he literally had to pay over $100,000 in fines or he was going to go to prison.   And this motherfucker is running for state senate. … So here's Ben, who's never ran a campaign in his life, and he's got all these people lined-up in as a campaign, as Victory, and what he's doing is he's circle-jerking Matt Maddock and Meshawn, to make sure that all of you who are running that get the Trump endorsement, and that when your districts are going to vote yes, for Matt Maddock to become the next Speaker of the House.  Trust me when I say that.*

***

*Meshawn and Matt Maddock and Ben Wetmore … they just keep manipulating you, over and over and over again.  Not only do I write strategy, we're not one of those groups.  And Audra can attest.  That just says, 'alright, we're going to collect your checks, and we'll see you when the election gets here.  Just say this, do this. Do this. I'm on the ground with you.  My team and I will be on the ground with you.*

***

*"Alright, if Ben gets Matt Maddock and Meshawn Maddock into the Speaker of the House, that'll be his biggest accomplishment.  His first candidate that he ever ran and is running is I guess, and I'm not speaking for her because I do not know her, is Melissa Carrone.  And I feel sorry for her because she's being targeted left and right …and they're all coming after me now.  Like I'm running.  I'm not running from shit.*

***

*"I have produced everything that you can put your fingers on, tangible.  As far as text messages go.  You saw the email from Ben to Melissa [Carone] yesterday.  He laughs it off [it, being Defendants' allegations of pay-to-play] like it's nothing.  There's going to come a day, bitch, that it's going to mean something.  And it's going to cost you your ass.  And I pray to God, I'm the one that gives it to you."*

**

*"They're a bunch of cowards.  This is a problem, too, with – and I'll be honest with you, new people running for office, they get scared, they get frightened.  They, they don't know what to do, because they've been threatened; their family's been threatened.  And the bottom line is, is how can you call yourself a patriot if you're not willing to stand up for what you believe in.  Even if you have to stand all by yourself."*

j.  <u>Secret Evidence Not Shared with Audience. Published December 1, 2021 via Facebook Live Video</u>.

*"I've posted more proof than I can. I've posted so much proof, that I can convict somebody of murder.  Seriously.  ... I've posted audio.  I've posted everything, but here's what I cannot do until it is time, and it's coming.  Quit your bitching and put me in a courtroom.  Put your hand on the Bible.  **And then the other three quarters of my evidence will come with me and my attorney.**  And then, we will see with all of the media there who's telling the truth and who is not."*

***

*"But if you think this is all the evidence that I got, you have lost your mind.  I want Michigan to wake up and realize that you're being played like a fool."*

***

*"[They] haven't said a word or disputed any of my allegations because I've got proof and if they do, oh my god I hope they do, Because when we do go to court, you're going to look like a friggin' fool."*

k.  <u>Encouraging Audience to Share Defamation. Published on December 1, 2021, via Facebook Live Video</u>.

*"Make sure you're sharing all of [these allegations] this.  Look, this doesn't get anywhere unless you share it.  This is what sets their hair on fire."*

\*\*\*

*"Anybody have any questions real quick? We're up; we've got a few viewers here. Let's get the shares up.  Come on.  Let's share this.  Let's go.  Let's go.  Come on! Where's my shares people of Michigan?*

\*\*\*

*"All of us just need to keep sharing and posting the word out there.  I mean, hell, everything is online on Facebook that shows you pay-to-play.  It shows you quid pro quo.  It's the same damn thing, just worded different.  You can't deny it.  … when the shit hits the fan [Meshawn and Ben] are going to be the ones that look like idiots.  Just saying."*

l.  <u>Clear Intent to Harm; Absolute Refusal to Retract. Published on December 1, 2021 via Facebook Live Video.</u>

*"I want to set it up for the people in Michigan.  Not myself.  But maybe we will have a rally in Lansing to condemn the MI-GOP leadership, especially Meshawn (Maddock) and Weisner [sic – Weiser].  I know Weisner is a billionaire and you could sue me into oblivion.  [Looking directly at the camera] Go fuck yourself.  I'm not backing down for anybody or anything, for any reason.  I'm just letting you know.  Look into my eyes.  Look, bad hair and all.  I'm not backing down for any reason.  You can kiss my ass.  If I say that I'm coming for you, I'm coming for you."*

\*\*\*

*"Is Ben a dirtbag? Yes, Jeffrey, that is correct."*

\*\*\*

*"You saw the email from Ben to Melissa [Carone] yesterday.  He laughs it off [it, being Defendants' allegations of pay-to-play] like it's nothing.  There's going to come a day, bitch, that it's going to mean something.  And it's going to cost you your ass.  And I pray to God, I'm the one that gives it to you."*

m.  <u>Clear Intent to Harm; Absolute Refusal to Retract.  Published December 7, 2021 via Facebook Live Video.</u>

*"This is a bombshell.  This is something that you cannot refute. You cannot deny. You cannot run away from.  [Looking directly into the camera] I've got you.  I got you, Ben.  I got you Matt.  And, I got you, Meshawn.  You're screwed.*

n. Defendants' False Allegations They Were Summoned by Secret Governmental
Tribunals to Present Their Evidence of Plaintiffs' Illegal, Felonious, and Corrupt
Activities. Published on December 7, 2021, via Facebook Live Video.

*"I have released this information to a couple of different entities today and I have
been summoned.  So, I will be boarding a plane tomorrow, and I'll tell you more
about that when I get back."*

o. Allegations Against Plaintiffs: Illegal, Felonious, and Corrupt Practices.
Intentional Interference with Business Relationships.  Published on December 7,
2021, via Facebook Live Video.

*"Everybody says to me, Adam, you're not sure, you don't have any proof.  Well,
first of all, I want to show you something.  The Michigan Supreme Court, in
November 2019, they issued a ruling, talking about the House rules, right.  They
issued a ruling about how rules apply and how things would happen when state
reps were in session, and what was able to happen with staffing, and what they
were to do.  Now, this comes directly from the Michigan Supreme Court, and I'm
going to give you the website real quick.  You can go to MCSC-SPD@mi.gov [this
is not a website].  This is the Michigan Supreme Court ruling that took place.  And
it's the rule 1-12.  And, I want to read this to you real quick.  It's 1-12.  And so,
here's what it says, the Michigan Supreme Court Rule that state political activities
on the job are prohibited.  You cannot engage in political activities during on-duty
hours.  This does not mean you cannot express political opinions about politics.  It
means you cannot attempt to persuade or dissuade anyone to be for or against any
candidate or issue while you're on duty – a paid staffer.  You also cannot do outside
political work on state time or using state resources.  Now, listen close.  This is the
Michigan Supreme Court: levying, soliciting for money, collecting, paying,
ordering, or authorizing any type of political assessment, is prohibited.  This is the
Michigan Supreme Court, November of 2019, rule 1-12.*

\*\*\*

*"So, November of the [legislative] session dates were the 2nd, 3rd, and 4th, the 9th,
and 10th, and then, the 30th.  Uh, Um, the state holidays were on the squares.  But
you can look this up for yourself, at the Michigan House of Representatives, um,
Majority House Floor Leader, Ben Frederick.  Now, that's not, just pay attention.
It's released from his office, and the dates.  So, I want you to pay attention, to the
dates that were in session.  2nd, 3rd, and 4th; 9th and 10th.  Wednesday the 10th is what
we're going to talk about.  Now, I'm also going to release to you in the comments
… the Michigan Campaign Finance expenditure.  I've already released this.
Showing this piece of paper right here.  Showing that Ben Wetmore has been paid
and been paid since 2018 by Matt Maddock and his campaign group and his PAC.
Now, we gotta do this one thing at a time, and I need you to follow me. So, I read
you the Supreme Court decision, and they made it a rule in the state of Missouri*

*[sic] and it was revised on November of 2019 to say [recites previously quoted purported passage, 'no levying, soliciting…'] Can't do no fundraisers, Ben, while Matt's in session.  Here's the problem, I'm going to flash this by so no one can see anything [moves a piece of paper in front of the camera, rapidly].  What you just saw, and what you won't see until we go to court, or until we're brought to court, is an affidavit.  I have two of them, and then I have another one of them, as a witness.  That they, these two affidavits – affidavits being a person that is signing a statement under the perjury [sic] of lying under oath.  Okay.  I'm going to read it to you.  'From the office of Adam Brassfield.'  This document is a signed affidavit from witness that is stated below, is true under the oath of office.  So and So, on November 10, 2021, was making political phone calls and participating in political fundraising, with Benjamin Wetmore, paid staffer of Matt Maddock at 5025 W. Saginaw Hwy, Lansing, Missouri [sic] 48917.  I was in the office when Matt Maddock – this is in the affidavit – came into the room, and Benjamin Wetmore informed him that the House was in session, was going in session, in 10 minutes.  However, I was told to continue work on campaign finance, raising money.  I did not, in any way know that this was illegal, until it was brought to my attention, of the requirements of the House in session, and paid staffer rules, such as Ben Wetmore.  I hereby stand by this statement under the penalty of law, and perjury, and will, at said time, testify to my statement.  [Looking directly into the camera] GUESS WHAT, ASSHOLE, I GOT YOU.  Here's what happened.  The Supreme Court of the State of Michigan basically says, while a, said state rep is in session, that a paid staffer cannot conduct political activities in said office, while in session.  These two affidavits and one witness, was in Ben Wetmore's office from 11:36 a.m., to 7:10 p.m.  I submitted this evidence to some people today.  All I can say is, you better get a mother humping lawyer, because you're corrupt from the top down, Meshawn, your husband Matt, and Ben Wetmore, the MI-GOP, you guys have utilized and used these candidates under Ben, to do corrupt actions inside of your office, Ben, while Matt has been in session."*

***

*"So, all you morons running for state rep in Michigan, or state senate, and Ben Wetmore is anywhere NEAR your campaign, guess what? **You may have violated the Michigan Supreme Court. [sic]  End of story**."*

***

*"I've been summoned over this by someone, and I'm leaving tomorrow … it's already in place – it's happening … So, for the last week or two I've been pushing and I've been pushing.  Why? Because I don't give a crap.  Nobody is going to hurt me.  Or do anything to my family.  You. Just. Don't. Know. Who. I. Am.  You'd better do some damned research."*

***

23

*"This is a monstrous law that has been broken.  It may not sound like much to you, but what this is, is it is a violation of - Matt Maddock and Ben Wetmore, who runs all of Meshawn's candidates, through the state, so that Matt has a chance at running speaker of the House. ... There's no denying this.  I have two signed affidavits. And one witness, that was there on November 10th, basically saying that for 6 hours, that money was being raised, phones calls were being raised for campaigns, financials services were being done, campaign finance was being taken care of, while Matt Maddock was being in session.  **That is illegal.  As a matter of fact, I talked to attorney, an attorney this afternoon, who said that this is probably a felony charge.  Don't know**."*

[NOTE: Subsequently, Defendants were challenged on their understanding of Michigan law.  Defendants rejected criticisms, insisting they confirmed their factual statements with multiple lawyers.  See the screenshot immediately below]



*"Tess Tesing the example I gave is a statement revised by the Michigan Supreme Court and yes it involves "Politics and Classified employees" like those receiving money from a PAC.  However, before I even made this video I confirmed, with attorneys, that this, at the very least, is a violation of House Rules and depending on the way the law is read for State Reps could also be criminal..."*

\*\*\*

*"Ben Wetmore is an attorney that got ran out of Texas and just somehow ended up in freakin Michigan.  He's a liar.  Matt Maddock is a liar.  Meshawn Maddock is a*

liar. And they're trying to be the Bill and Hillary Clinton of Michigan. And, you the people have to know you gotta stand up against this. Every single candidate that has, that literally has had a part to do with Ben Wetmore, and the Maddocks, you need to , you need to push them off. Because you don't know whether or not they have [broken laws]. It's ridiculous. They broke the damn law! Now what are you going to do Michigan?

\*\*\*

"The Michigan Supreme Court says you can't do anything that Ben Wetmore did on November 10th, and if he done it on the 10th, you can take it to the bank that he did it before. And for all of your candidates who are under his thumb, and Meshawn and Matt Maddock's thumb because ... because I will not mother-flippin stop, until those two are out of a job in Michigan. I will spend every dime I have. I will sell my house. I will do everything I can to make sure that at least the most corrupt state that I've ever walked through in the history of my political life, is freed from this mess. You deserve to be free."

\*\*\*

"It's time to send these people home. They're breaking the law."

\*\*\*

"For all of you who want out. I got your back. But you'd better start signing an affidavit faster than you can blink your eyes, because if I find out – AND I WILL – I've got a couple of people up there that have nothing to do with the state. Matter of fact, they don't even live in the State of Michigan. Working hard, because President Trump is getting played, just like you are. It's sad. Meshawn, you're pathetic. You and your husband are pathetic people. You're just disgusting. What are you doing? All this money that you're raking in through your PACs, and through back door channels and all these candidates ... keeping people involved in politics that can't even vote. They've got more felonies than I have toes and fingers. What the hell is wrong with you people. Michigan this is your chance right now this is your chance to say I've had enough. I'm sick of it. It has nothing to do with voting in or voting out a state rep. It has everything to do with you finally standing up. I HAVE THE PROOF RIGHT HERE. I've got the proof, I've got the affidavits, testimonies, under penalty of perjury when they testify. I've got the proof of payment right here, from Matt Maddock directly to Ben Wetmore. We all know that. I've got the proof right here that on said November 10th ... Matt was in session."

\*\*\*

"I've got the facts. I've got the affidavits, the witnesses are there. I'm not afraid of nothing. Come get me. I mean just come get me. You're a bunch of piss-ants.

*And I just broke your, uh, party.  THEY BROKE THE LAW right in front of your eyes.  Right in front of your eyes."*

\*\*\*

*"All you need to know is that Ben, as a paid staffer, he broke the law of the Michigan Supreme Court by having people make phone calls and fundraising for six hours in his office while Matt Maddock was in session."*

\*\*\*

*"Hey, love you guys [audience], get the message out there.  Get everybody to stand up against each crooked punk people. Enough is enough."*

\*\*\*

*"You know how you [make a better country], call all of these state reps, who has Ben Wetmore, and Meshawn and Matt Maddock's backing, and you tell them, drop them or I will not vote for you. That's how you do it."*

p.  Allegations of Illegal Pay-to-Play Schemes.  Published December 14, 2021, via Facebook Live Video.

*"Okay, so I've already showed you pay-to-play from myself and Ben Wetmore's text messages.  I mean, I've already showed you, that you seen [sic] it.  He [Ben] guaranteed for Audra Johnson to drop out of the third district [race] ...He guaranteed Audra Johnson if she dropped out of the third district – I put it out there for him to say yes or no; we set him [Ben] up – that she would be guaranteed a Trump endorsement and the financial backing of not only Mr. Maddock, but Mrs. Meshawn Maddock.  And that is called paid to play or quid pro quo.  All right.  No matter how you look at it, it's wrong.  It's unethical.  It's on, it's unconst [sic]...*

\*\*\*

*"Here's what I'm trying to tell you.  Everybody wants to know the connection of where Meshawn and Matt are on funneling money to make sure that state candidates get their auto-penned[4] endorsement.  ... Trump has no idea who the fuck you are.  And let me tell you something else Meshawn I know your girl Molly: I'm fixing to blow the doors off this. I'm sick of corruption.  It's got to stop."*

\*\*\*

---

[4] This allegation is that President Trump didn't even sign the endorsement, but that Plaintiffs, in collaboration with Meshawn and Matt Maddock, signed on behalf of Trump, and that thereby, the endorsement is invalid and illegitimate.

*"I have the documents that I need to prove that Ben Wetmore ... was in the office with people that were running for the first time.  These are affidavits, on the 10th of November.  Actually one of the affidavits, this may surprise you, I'm not going to say a name, one of them got a Trump endorsement last night.  That's one of the affidavits that's sworn to tell the truth under the penalty of perjury."*

\*\*\*

*"Everybody who's got a Trump endorsement, that is not Jackie Eubanks and Matt DePerno – people who have actually went down and got the endorsements on good merit.  All of you have an auto-penned signed piece of paper.  You've never shook hands with Donald Trump.  You have never spoken with Donald Trump ... They're lying to you, Michigan!"*

q.  <u>Suggesting That Defendants' Have Secret Evidence of Illegal Activity Involving Plaintiffs; Suggesting That Because of This, Defendants' Lives Are Endangered. Published on December 14, 2021 via Facebook Live Video.</u>

*"I Officially invite the Michigan House of Representatives and the Speaker of the House and the Michigan Senate and the Senate Majority Leaders, to invite me to testify without an attorney and show you my evidence of political corruption in the Maddock family, and in Senator Bumstead's family, and the Yob family.  Now, I'll have a security detail – but I invite the Michigan House of Representatives and the Michigan Senate to subpoena me immediately.  And I will testify in front of your committees.  We can work out a date.  I mean, we've got Christmas coming up, but I mean I'll be ready to go.  Deer season ends January 15th.  So, I would say any time after January 15th, all the way into the spring.  You have my word that I will. Once we've agreed upon a date, I will show up with my written evidence and with my screenshots, and with my affidavits.  And I will testify in front of the House and the Senate to show you how corrupt the Maddock family has become ... I am willing to come testify without an attorney, only with a security detail, and tell the truth and show them and give them every piece of my evidence.  Watch what happens."*

\*\*\*

*"Listen, politically, you can come after me however you want to – I don't care how you come after me ... And if, and if half the people here don't want to be friends with me after this conversation, I don't care.  I could care less, seriously.  Because, I've opened myself up to a subpoena to the Michigan State.  And I promise you, the people that are involved in this, they will not show up.  They won't show up.  But it is very sad that a mother of two children, or a father of two children, who actually live in their home, and they have a wife and they're trying to work through and make it through the winter, that they're unable to get their unemployment claims pass through, unless you have some sort of deal with Meshawn Maddock.*

\*\*\*

*"I've got nothing to hide.  I got all the evidence and I've got an affidavit signed. I'm not worried about it.  The house, the Speaker of the House needs to subpoena me in closed session, and so does the Senate.  They don't even have to be, hell you can have me."*

\*\*\*

*"I've got pay to play from two different people.  One of them is a sitting senator, and his aide, Ben Wetmore."*

\*\*\*

*"And again, there's corruption all over the state and all leads back to the Yob family and the Maddock family.  Again, I'm waiting on my subpoena.  Please, God, subpoena me.  Somebody knock on my house door, my office door from the Sheriff's Department, and give me a subpoena."*

**[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]**

r.  <u>Facebook Post - November 29, 2021. Post One.  Allegations that Plaintiffs Engaged in bribery, "pay to play," and Further Implying Ben's Assistance to Meshawn Maddock Defrauded Donors.</u>



**Adam Brassfield**
November 29, 2021 · 🌐                                                                        •••

Mike Detmer must be the pig, because here is just a short bit of the conference call between myself, Audra Johnson, Meshawn and Ben. Which she now says she does not know who "Pay for Play Ben" is. Forgive the audio 4-way call in the woods. But, Listen closely at how Meshawn responds to everything I said in my letter about Jon Rocha. #thereisalist #Facts There is SO MUCH MORE that I will embarrass the Hell out of Detmer with in this call. CJ Ritchard Mellissa Carone #michigan #MIGOP It is in the hands of 5 other people. Meshawn must resign. Jon Rocha must give back ALL donations from his Congressional Campaign. NOW! Its going to get worse. Try Me!

Meshawn                                        Ben

▶  1:15 / 2:28                                          ⚙  ⤢  ⧉  🔇

👍😮😂  18                                    40 Comments  47 Shares

👍 Like              💬 Comment              ↪ Share

s. <u>Facebook Post – November 29, 2021. Post Two. Allegations that Plaintiffs Engaged in bribery, "pay to play," and Further Implying Ben's Assistance to Meshawn Maddock Defrauded Donors.</u>

 **Adam Brassfield**
November 29, 2021 · 🌐

Mike Detmer must be the pig, because here is just a short bit of the conference call between myself, Audra Johnson, Meshawn and Ben. Which she now says she does not know who "Pay for Play Ben" is. Forgive the audio 4-way call in the woods. But, Listen closely at how Meshawn responds to everything I said in my letter about Jon Rocha. #thereisalist #Facts There is SO MUCH MORE that I will embarrass the Hell out of Detmer with in this call. CJ Ritchard Mellissa Carone #michigan #MIGOP It is in the hands of 5 other people. Meshawn must resign. Jon Rocha must give back ALL donations from his Congressional Campaign. NOW! Its going to get worse. Try Me!



Listen Close

👍😮😆 18                                    40 Comments  47 Shares

**Adam Brassfield**
More text between myself and Ben, before I set up this call. 2 minutes of 30 minutes. Lol. Hey **Mike Detmer** you going to keep talking? Cause I can do this all day. Your apart of a corrupt mob.



Like   Reply   21w                                          😮👍🤣 4

**Adam Brassfield**
"Pay for Play" Ben and Meshawn.

Like   Reply   21w                                          👍 3

t.   <u>Facebook Post – November 30, 2021. Post One. More Allegations of Plaintiffs' Fraud and False Promises of Additional Evidence Proving Fraud.</u>



u. <u>Facebook Post – November 30, 2021. Post Two. Allegations Plaintiffs Engage in Fraud; Urging the Public to Demand Ben Wetmore and Others Resign; Comparing Plaintiffs' Conduct to Convicted Former Governor of Illinois, Rod Blagojevich.</u>



v.  <u>Facebook Post – December 2, 2021. Post One. Allegations Plaintiffs are Incompetent in Managing Political Campaigns and Finances Related Thereto.</u>



w.  <u>Facebook Post – December 2, 2021.  Post Two. Allegations of Plaintiffs' Financial
Malfeasance, Pocketing Campaign Contributions.</u>



**Adam Brassfield**
December 2, 2021 · 🌐

Hey Mike Detmer John Rocha Angela Rigas Ben Wetmore, since you guys are fundraising off
of your "Citizen Initiative" bull shit. Can you please tell voters where the Money is? What Bank?
Also, how many signatures? You have been on this for 4 months. Jon, you're the President, you
should be able to answer this question, without bull shit right? BTW, I just found out that Marty
Basick and Frank Carson are the same person...Mike Detmer's campaign Manager Larry
Parsons...weird, don't you think Mike?



14                                        27 Comments  6 Shares

👍 Like                    💬 Comment                    ↪ Share

x.  <u>Facebook Post – December 5, 2021. Allegations of Plaintiffs' Engaging in a
Scheme for Procuring Phony Endorsements From Former President Trump.</u>



y.  <u>Facebook Post - December 6, 2021.  Allegations Implying Plaintiffs Recruited Felons to Run as Political Candidates and Work for the Michigan Republican Party.</u>



z.   <u>Facebook Post – April 21, 2022.   Allegations of a Secret Email Demonstrating Plaintiffs Involved in Bribery.</u>



aa. <u>Facebook Post – May 3, 2022.  Allegations That Plaintiffs Defrauded Multiple Non-profits in Texas, and that Matt and Meshawn Hired Plaintiffs Because Plaintiffs Are Skilled Fraudsters.</u>





bb. <u>Facebook Post – May 3, 2022.  Allegations Plaintiffs Are Felons and Embezzled Campaign Funds While Running for Judge in Texas; Hidden Evidence.</u>



**The Relationship Between, Composition, and Motivations of the Defendants**

21.     Defendant Veronica Brassfield is the wife of Defendant Adam Brassfield.

22.     Upon information and belief, at all times relevant hereto, and along with Adam Brassfield, Defendant Veronica Brassfield co-owns and co-manages Defendants Adam Brassfield, Inc., and Brass21 Productions, LLC, and possibly other corporate entities.

23.     In addition to being owned and managed by Defendants Adam and Veronica Brassfield, at all relevant times Defendants Brass21 Productions, LLC, and Adam Brassfield, Inc., are staffed by multiple, presently unknown employees, contractors, and/or agents.   In his defamatory publications described more fully, *supra*, Adam Brassfield references an entire "team" of people staffing his companies.

24.     Upon information and belief, Defendant Adam Brassfield was raised in Arkansas and has resided in Missouri for approximately the past decade.

25.     Upon information and belief, *prior* to the 2022 political cycle, Defendant Adam Brassfield had no connections to the State of Michigan, including business and political relationships.

26.     As the primary managers of Defendants Adam Brassfield, Inc., and Brass21 Productions, LLC, and at all times relevant hereto, Defendant Veronica Brassfield *directly collaborated* with Adam Brassfield and others to develop the text of Adam Brassfield's various social media posts, as well as the "talking points" for Adam Brassfield's numerous Facebook Live Video publications, all of which were published for the purpose of harassing and defaming Plaintiffs, among others.

27.     In addition to being paid as campaign managers for multiple political campaigns in Michigan, Defendants have been, and continue to be compensated (as of the filing of this

Complaint) by **third parties** for the purpose of harassing and defaming Plaintiffs, Meshawn, Matt, and others, beginning at least as early as October of 2021, and continuing to the present day.

28.     For example, though a full-time resident of Missouri, by his own admission, Defendant Adam Brassfield spent *weeks at a time* in Michigan during the current election cycle:[5]



**Adam Brassfield**
**Andrea Drea** I e been in Michigan twice for 3 weeks at a time since February and I'm about to return, again. I am there helping candidates fight back. Some listen, some don't. But I would be careful calling people "Patriots". Some are wolves in sheep clothing. But point taken Mam.

Like    Reply    1w

29.     Defendants Adam and Veronica Brassfield declared bankruptcy in the Eastern District of Missouri in 2020, are not independently wealthy, and could not afford to spend weeks at a time in Michigan but for receiving payments by third parties.

30.     Upon information and belief, Defendants are presently working with multiple third parties, including but not limited to Steven Bresnen of Austin, Texas, to harass and defame Plaintiffs.   Defendants have published defamatory statements based upon defamatory communications sent by Bresnen and/or his agents to Defendants.

31.     Unless enjoined by this Court, Defendants will continue to harass and defame Plaintiffs, among others.

32.     Defendants' provably false and defamatory statements discussed at length, *supra*, in paragraphs 17-20 and **Exhibits 1 & 2**,  were made via social media posts and live video streaming monologues (which did permit Defendants, through their spokesman Adam Brassfield)

---

[5] Posted by Defendant Adam Brassfield on April 21, 2022.
https://www.facebook.com/profile.php?id=100010121351192 (last accessed May 8, 2022).

to interact in real-time with the public and customers and prospective customers of Defendants' services.

33.     Defendants' past and ongoing live video transmissions act as a kind of interactive infomercial advertising campaign, constantly promoting Defendants' services, while at the same time, and in the strongest possible terms, communicating false and misleading claims about Plaintiffs, who are direct competitors with Defendants.

34.     Defendants engaged in this advertising campaign of defamation and false advertising for the purpose of **materially** deceiving and influencing customers' purchasing decisions, and to drive sales away from Plaintiffs and to Defendants.

35.     For example, Plaintiffs have lost at least six (6) clients as a direct result of Defendants' material misrepresentations, blatant falsehoods, innuendos, indirect intimations, and ambiguous suggestions in their advertisements to Michigan political candidates.

**Defendants' Allegations Were Not Opinions, But <u>False</u> Statements of Fact.**

36.     All of Defendants' defamatory statements contained in this Complaint were objectively verifiable statements of fact and presented as such in Defendants' social media posts and videos.  *See* ¶20, *supra*; *see also* **<u>Exhibit 2</u>**, attached hereto and incorporated as though fully restated and set-forth, herein.

37.     In no uncertain terms, through their spokesman Adam Brassfield, Defendants repeatedly stated that **<u>all</u>** of their allegations about Plaintiffs were factual, objectively verifiable, and true, and that Defendants possessed a large amount of evidence proving all of the statements.

*38.     Defendants stated that they were withholding the majority of their evidence from the public in order to protect their sources from physical, financial, and career harm.*

**Defendants Published the Statements With
Knowledge of Their Falsity or Serious Doubts About Their Truth.**

39.     Defendants knew that their statements about Plaintiffs were not true *or had serious
doubts about their truth*.

40.     Plaintiffs confronted Defendants through their spokesman, Adam Brassfield, and
repeatedly informed him that his statements were absolutely false.   Defendants disregarded
Plaintiffs' corrections, and had no credible basis for the false allegations they continued to make.

41.     Defendants could have, but deliberately chose not to contact Plaintiffs to confirm
or disconfirm the veracity of their defamatory statements prior to publishing their defamatory
statements.

42.     Defendants have bragged about "setting up" Plaintiffs in secretly recorded phone
calls.

43.     Defendants ignored the truth because they had a predetermined set of allegations in
mind, because they were being paid by third parties to hurt Plaintiffs' reputations, and those of
Ben's former boss, Matt Maddock, as well as Maddock's wife, Meshawn, and because Defendants
sought to damage Plaintiffs' brand and to lure Plaintiffs' present and future clients away from
Plaintiffs to become clients of the Defendants.

44.     Defendants made all of the defamatory statements complained of herein, with
actual malice.

45.     Defendants repeatedly stated that they would never apologize or retract their
statements.[6]

**Defendants Caused Substantial Reputational and Business
Harm With Their False Statements About Plaintiffs**

---

[6] As one of innumerable examples, *see* ¶20(l), *supra*: "I'm not backing down for anybody or anything, for any reason.
I'm just letting you know.   Look into my eyes.   Look, bad hair and all.   I'm not backing down for any reason.   You
can kiss my ass.   If I say that I'm coming for you, I'm coming for you."

46.     All of the statements described herein as defamatory (*see infra*, at ¶¶ 17-20; *see also* **Exhibits 1 and 2**), are objectively verifiable and false.

47.     Defendants' statements (*see infra*, at ¶¶ 17-20; *see also* **Exhibits 1 and 2**), are false and constitute defamation under Missouri law; they impute to Plaintiffs a want of knowledge, skill, capacity or fitness to perform, as well as the commission of multiple crimes and the propensity to commit crime.

48.     Given the nature of Ben's employment as a former legislative aide to State Representative Matt Maddock, and his work with Plaintiff Victory Strategies, LLC, Defendants' false and defamatory statements (that Plaintiffs engaged in, *inter alia*, fraud, bribery, campaign finance violations, misleading the public, a criminal conspiracy of extortion, that Ben is a felon who defrauded multiple non-profit corporations in Texas, and all of the other allegations more fully discussed, infra in ¶¶ 17-20, and **Exhibits 1 & 2**) tend to and have injured Plaintiffs in their trade, office, or profession.  A reputation for integrity is a requirement for workers in a profession whose responsibilities include assisting a State Representative, political consulting, and managing campaigns for candidates for state and federal offices.  Working for elected representatives, either as an aide or as a campaign manager requires trust and confidence, and absolutely requires a solid reputation for honesty and integrity, and Plaintiffs' career, business and brand have all been severely damaged.

49.     As a direct result of Defendants defamatory statements, clients have terminated their relationship with Plaintiffs or backed out of planned business relationships with Plaintiffs, causing direct pecuniary losses to Plaintiffs.

50.     Defendants are directly responsible for the reputational harm and loss of business that Plaintiffs have experienced.

51.     Defendants knew prior to making their defamatory statements that Ben is a lawyer.

52.     Defendants knew that having a reputation for honesty and integrity is essential for a lawyer, and that developing a reputation for dishonesty and criminal activity could subject Ben to state bar investigations.

53.     Defendants knew their defamatory statements were false and malicious, but they made them anyway.

54.     Defendants' defamatory statements have circulated throughout social media, and they have harmed and will continue to harm Plaintiffs reputations, and damage or prevent employment prospects, business relationships, and prospective business relationships.

55.     As a direct result of Defendants' defamatory statements Plaintiffs have lost clients and prospective clients.

56.     As a direct result of Defendants' defamatory statements, the credibility of Ben's articles as an analyst and writer for TGPFactCheck.com has diminished in the eyes of his readers. This has resulted in additional reputational and pecuniary damages.

57.     As a direct result of Defendants' defamatory statements, members of the public demanded that Matt Maddock terminate Ben's employment.  For example:



## CAUSES OF ACTION

### I : Libel (with Actual Malice) Against Defendant Adam Brassfield
#### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC

("Victory") (collectively, "Plaintiffs"), and for their cause of action of Libel (with Actual Malice)

against Defendant Adam Brassfield ("Brassfield"), state to the Court as follows:

58.   Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

59.   As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Brassfield published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

60.   These Statements are provably and categorically false.

61.   These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

        a.   subject Plaintiffs to hatred, ridicule, and contempt;

        b.   diminish Plaintiffs' standing in the community; and

        c.   denigrate Plaintiffs' fitness in their profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

62.   The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

63.   Brassfield did not publish his Statements and false accusations as mere parody or opinion.

64.   Brassfield published his Statements and false accusations therein as fact.

65.   Brassfield's Statements were unprivileged.

66.   Brassfield published the Statements either maliciously – because he dislikes Plaintiffs and because he has been compensated to defame and harass Plaintiffs – or with reckless disregard of the truth or falsity of the Statements, at a time when he had doubts as to whether the Statements were true.

67.     Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Brassfield's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Brassfield's defamatory Statements, Plaintiffs' reputations have been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

68.     Brassfield's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Brassfield and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant Adam Brassfield for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### II : Libel (with Common Law Malice) Against Defendant Adam Brassfield
#### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their cause of action of Libel (with Common Law Malice) against Defendant Adam Brassfield ("Brassfield"), state to the Court as follows:

69.     Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

70.     As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Brassfield published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

71.     These Statements are provably and categorically false.

72.     These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

        a.      subject Plaintiffs to hatred, ridicule, and contempt;

        b.      diminish Plaintiffs' standing in the community; and

        c.      denigrate Plaintiffs' fitness in their profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

73.     The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

74.     Brassfield did not publish his Statements and false accusations as mere parody or opinion.

75.     Brassfield published his Statements and false accusations therein as fact.

76.     Brassfield's Statements were unprivileged.

77.     Brassfield's Statements and false accusations were published with Common Law Malice.

78.     Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Brassfield's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Brassfield's defamatory Statements, Plaintiffs' reputation has been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

79.     Brassfield's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Brassfield and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant Adam Brassfield for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### III : Libel (with Actual Malice) Against Defendant Veronica Brassfield
**(Plaintiffs Ben Wetmore and Victory Strategies, LLC)**

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs"), and for their cause of action of Libel (with Actual Malice) against Defendant Veronica Brassfield ("Brassfield"), state to the Court as follows:

80.     Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

81.     As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Brassfield published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

82.     These Statements are provably and categorically false.

83.     These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

     a.     subject Plaintiffs to hatred, ridicule, and contempt;

      b.      diminish Plaintiffs' standing in the community; and

      c.      denigrate Plaintiffs' fitness in their profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

84.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

85.    Brassfield did not publish her Statements and false accusations as mere parody or opinion.

86.    Brassfield published her Statements and false accusations therein as fact.

87.    Brassfield's Statements were unprivileged.

88.    Brassfield published the Statements either maliciously – because she dislikes Plaintiffs and/or because she was compensated by third parties to harass and defame Plaintiffs – or with reckless disregard of the truth or falsity of the Statements, at a time when she had doubts as to whether the Statements were true or false.

89.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Brassfield's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Brassfield's defamatory Statements, Plaintiffs' reputations have been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

90.    Brassfield's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Brassfield and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant **Veronica** Brassfield for reputational and other damages in such sum

in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### IV : Libel (with Common Law Malice) Against Defendant Veronica Brassfield
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their cause of action of Libel (with Common Law Malice) against Defendant Adam Brassfield ("Brassfield"), state to the Court as follows:

91.     Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

92.     As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Brassfield published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

93.     These Statements are provably and categorically false.

94.     These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

      a.      subject Plaintiffs to hatred, ridicule, and contempt;

      b.      diminish Plaintiffs' standing in the community; and

      c.      denigrate Plaintiffs' fitness in their profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

95.     The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

96.     Brassfield did not publish her Statements and false accusations as mere parody or opinion.

97.     Brassfield published her Statements and false accusations therein as fact.

98.     Brassfield's Statements were unprivileged.

99.     Brassfield's Statements and false accusations were published with Common Law Malice.

100.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Brassfield's Statements, Plaintiffs would not have suffered significant pecuniary damages.   As a direct and proximate cause of Brassfield's defamatory Statements, Plaintiffs' reputations have been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

101.    Brassfield's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Brassfield and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant **Veronica** Brassfield for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### V : Libel (with Actual Malice) Against Adam Brassfield, Inc.
**(Plaintiffs Ben Wetmore and Victory Strategies, LLC)**

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs"), and for their cause of action of Libel (with Actual Malice) against Defendant Adam Brassfield, Inc. ("Company 1"), state to the Court as follows:

102.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

103.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Company 1 published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

104.    These Statements are provably and categorically false.

105.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

      a.    subject Plaintiffs to hatred, ridicule, and contempt;

      b.    diminish Plaintiffs' standing in the community; and

      c.    denigrate Plaintiffs' fitness in his profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

106.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

107.    Company 1 did not publish its Statements and false accusations as mere parody or opinion.

108.    Company 1 published its Statements and false accusations therein as fact.

109.    Company 1's Statements were unprivileged.

110.    Company 1 published the Statements either maliciously – because it dislikes Plaintiffs and/or because it was compensated by third parties to harass and defame Plaintiffs – or

with reckless disregard of the truth or falsity of the Statements, at a time when it had doubts as to whether the Statements were true or false.

111.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Company 1's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Company 1's defamatory Statements, Plaintiffs' reputations have been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

112.    Company 1's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Company 1 and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant Adam Brassfield, Inc. for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Adam Brassfield, Inc.'s defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### VI : Libel (with Common Law Malice) Against Adam Brassfield, Inc.
#### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COMES NOW Plaintiff Ben Wetmore ("Wetmore") and for its cause of action of Libel (with Common Law Malice) against Defendant Adam Brassfield, Inc. ("Company 1"), states to the Court as follows:

113.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

114.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Company 1 published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

115.    These Statements are provably and categorically false.

116.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

   a.    subject Plaintiffs to hatred, ridicule, and contempt;

   b.    diminish Plaintiffs' standing in the community; and

   c.    denigrate Plaintiffs' fitness in their professions as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

117.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

118.    Company 1 did not publish its Statements and false accusations as mere parody or opinion.

119.    Company 1 published its Statements and false accusations therein as fact.

120.    Company 1's Statements were unprivileged.

121.    Company 1's Statements and false accusations were published with **common law malice**.

122.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Company 1's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Company 1's defamatory Statements, Plaintiffs' reputation has been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

123.    Company 1's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Company 1 and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant Adam Brassfield, Inc. for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Adam Brassfield, Inc.'s defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### VII : Libel (with Actual Malice) Against Brass21 Productions, LLC
**(Plaintiffs Ben Wetmore and Victory Strategies, LLC)**

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs"), and for their cause of action of Libel (with Actual Malice) against Defendant Adam Brassfield ("Brassfield"), state to the Court as follows:

124.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

125.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Company 2 published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

126.    These Statements are provably and categorically false.

127.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

    a.      subject Plaintiffs to hatred, ridicule, and contempt;

b.      diminish Plaintiffs' standing in the community; and

c.      denigrate Plaintiffs' fitness in his profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

128.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

129.    Company 2 did not publish its Statements and false accusations as mere parody or opinion.

130.    Company 2 published its Statements and false accusations therein as fact.

131.    Company 2's Statements were unprivileged.

132.    Company 2 published the Statements either maliciously – because it dislikes Plaintiffs and/or because it was compensated by third parties to harass and defame Plaintiffs – or with reckless disregard of the truth or falsity of the Statements, at a time when it had doubts as to whether the Statements were true or false.

133.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Company 2's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Company 2's defamatory Statements, Plaintiffs' reputations have been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

134.    Company 2's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Company 2 and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant Brass21 Productions, LLC for reputational and other damages in such

sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brass21 Productions, LLC's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### VIII : Libel (with Common Law Malice) Against Brass21 Productions, LLC
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their cause of action of Libel (with Common Law Malice) against Defendant Adam Brassfield ("Brassfield"), state to the Court as follows:

135.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

136.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Company 2 published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

137.    These Statements are provably and categorically false.

138.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

a.    subject Plaintiffs to hatred, ridicule, and contempt;

b.    diminish Plaintiffs' standing in the community; and

c.    denigrate Plaintiffs' fitness in their professions as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

139.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

140.     Company 2 did not publish its Statements and false accusations as mere parody or opinion.

141.     Company 2 published its Statements and false accusations therein as fact.

142.     Company 2's Statements were unprivileged.

143.     Company 2's Statements and false accusations were published with **common law malice**.

144.     Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Company 2's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Company 2's defamatory Statements, Plaintiffs' reputation have been damaged in an amount in excess of seventy-five thousand dollars ($75,000).

145.     Company 2's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter Company 2 and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Defendant Brass21 Productions, LLC for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brass21 Productions, LLC's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### IX : Injurious Falsehood Against Defendant Adam Brassfield
**(Plaintiffs Ben Wetmore & Victory Strategies, LLC)**

COME NOW Plaintiffs Ben Wetmore ("Wetmore") and Victory Strategies, LLC ("Victory") and for their cause of action of Injurious Falsehood against Defendant Adam Brassfield ("Brassfield"), states to the Court as follows:

146.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

147.    Wetmore, as the principal employee and "face" of Victory, has an identify of interest with Victory, such that defamatory attacks upon Victory are also direct attacks upon himself, and *vice versa*.

148.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Brassfield published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

149.    These Statements are provably and categorically false.

150.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

    a.      subject Plaintiff to hatred, ridicule, and contempt;

    b.      diminish Plaintiffs' standing in the community; and

    c.      denigrate Plaintiffs' fitness in his profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

151.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

152.    Brassfield did not publish his Statements and false accusations as mere parody or opinion.

153.    Brassfield published his Statements and false accusations therein as fact.

154.    Brassfield's Statements were unprivileged.

155.    Brassfield published the Statements either maliciously – because he dislikes Plaintiffs and/or because he was compensated by third parties to harass and defame Plaintiffs.

156.     Brassfield intended that his Statements would result in harm to Plaintiffs and/or Brassfield should have recognized that the Statements were likely to result in harm to Plaintiffs.

157.    Brassfield knew his Statements were false or acted with reckless disregard of the truth or falsity of the Statements, at a time when he had doubts as to whether the Statements were true or false.

158.    Plaintiffs suffered pecuniary losses as a result of Brassfield's Statements.

159.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

160.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Brassfield's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Brassfield's defamatory Statements, Plaintiffs' reputations have been damaged and they have incurred reputational and business losses in an amount in excess of seventy-five thousand dollars ($75,000).

161.    Brassfield's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter him and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Adam Brassfield for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Adam Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

## X : Injurious Falsehood Against Veronica Brassfield
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Wetmore") and Victory Strategies, LLC ("Victory") and for their cause of action of Injurious Falsehood against Defendant Veronica Brassfield ("Brassfield"), states to the Court as follows:

162.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

163.    Wetmore, as the principal employee and "face" of Victory, has an identify of interest with Victory, such that defamatory attacks upon Victory are also direct attacks upon himself, and *vice versa*.

164.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Brassfield published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

165.    These Statements are provably and categorically false.

166.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

        a.    subject Plaintiffs to hatred, ridicule, and contempt;

        b.    diminish Plaintiffs' standing in the community; and

        c.    denigrate Plaintiffs' fitness in his profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

167.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

168.    Brassfield did not publish her Statements and false accusations as mere parody or opinion.

169.    Brassfield published her Statements and false accusations therein as fact.

170.    Brassfield's Statements were unprivileged.

171.    Brassfield published the Statements either maliciously – because she dislikes Plaintiffs and/or because she was compensated by third parties to harass and defame Plaintiffs.

172.    Brassfield intended that her Statements would result in harm to Plaintiffs and/or Brassfield should have recognized that the Statements were likely to result in harm to Plaintiffs.

173.    Brassfield knew her Statements were false or acted with reckless disregard of the truth or falsity of the Statements, at a time when she had doubts as to whether the Statements were true or false.

174.    Plaintiffs suffered pecuniary losses as a result of Brassfield's Statements.

175.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and

misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

176.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Brassfield's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Brassfield's defamatory Statements, Plaintiffs' reputations have been damaged and they have incurred reputational and business losses in an amount in excess of seventy-five thousand dollars ($75,000).

177.    Brassfield's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter her and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Veronica Brassfield for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Veronica Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

## XI : Injurious Falsehood Against Adam Brassfield, Inc.
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Wetmore") and Victory Strategies, LLC ("Victory") and for their cause of action of Injurious Falsehood against Defendant Adam Brassfield, Inc. ("Company 1"), states to the Court as follows:

178.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

179.    Wetmore, as the principal employee and "face" of Victory, has an identify of interest with Victory, such that defamatory attacks upon Victory are also direct attacks upon himself, and *vice versa*.

180.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Company 1 published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

181.    These Statements are provably and categorically false.

182.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

      a.    subject Plaintiffs to hatred, ridicule, and contempt;

      b.    diminish Plaintiffs' standing in the community; and

      c.    denigrate Plaintiffs' fitness in his profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

183.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

184.    Company 1 did not publish his Statements and false accusations as mere parody or opinion.

185.    Company 1 published his Statements and false accusations therein as fact.

186.    Company 1's Statements were unprivileged.

187.    Company 1 published the Statements either maliciously – because it dislikes Plaintiffs and/or because it was compensated by third parties to harass and defame Plaintiffs.

188.     Company 1 intended that its Statements would result in harm to Plaintiffs and/or Company 1 should have recognized that the Statements were likely to result in harm to Plaintiffs.

189.    Company 1 knew its Statements were false or acted with reckless disregard of the truth or falsity of the Statements, at a time when he had doubts as to whether the Statements were true or false.

190.    Plaintiffs suffered pecuniary losses as a result of Company 1's Statements.

191.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

192.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Company 1's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Company 1's defamatory Statements, Plaintiffs' reputations have been damaged and they have incurred reputational and business losses in an amount in excess of seventy-five thousand dollars ($75,000).

193.    Company 1's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter it and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Adam Brassfield, Inc. for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Adam Brassfield, Inc.'s defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.


## XII : Injurious Falsehood Against Brass21 Productions, LLC
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)


COME NOW Plaintiffs Ben Wetmore ("Wetmore") and Victory Strategies, LLC ("Victory") and for their cause of action of Injurious Falsehood against Defendant Brass21 Productions, LLC ("Company 2"), states to the Court as follows:

194.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

195.    Wetmore, as the principal employee and "face" of Victory, has an identify of interest with Victory, such that defamatory attacks upon Victory are also direct attacks upon himself, and *vice versa*.

196.    As more fully described above in paragraphs 17-20 and **Exhibits 1 & 2**, Defendant Company 2 published multiple false and defamatory statements ("Statements") of and concerning Plaintiffs.

197.    These Statements are provably and categorically false.

198.    These Statements are capable of a defamatory meaning because, when read by a reasonable reader in context they:

    a.    subject Plaintiffs to hatred, ridicule, and contempt;

    b.    diminish Plaintiffs' standing in the community; and

    c.    denigrate Plaintiffs' fitness in his profession as a legislative aide, as a lawyer, as a political consultant, and as a campaign manager.

199.    The Statements are defamatory per se because they are defamatory on their face without any reference to outside material.

200.    Company 2 did not publish his Statements and false accusations as mere parody or opinion.

201.    Company 2 published his Statements and false accusations therein as fact.

202.    Company 2's Statements were unprivileged.

203.    Company 2 published the Statements either maliciously – because it dislikes Plaintiffs and/or because it was compensated by third parties to harass and defame Plaintiffs.

204.    Company 2 intended that its Statements would result in harm to Plaintiffs and/or Company 2 should have recognized that the Statements were likely to result in harm to Plaintiffs.

205.    Company 2 knew its Statements were false or acted with reckless disregard of the truth or falsity of the Statements, at a time when he had doubts as to whether the Statements were true or false.

206.    Plaintiffs suffered pecuniary losses as a result of Company 2's Statements.

207.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and

misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

208.    Even though the Statements are defamatory per se and actionable irrespective of allegations of special harm, but for Company 2's Statements, Plaintiffs would not have suffered significant pecuniary damages.  As a direct and proximate cause of Company 2's defamatory Statements, Plaintiffs' reputations have been damaged and they have incurred reputational and business losses in an amount in excess of seventy-five thousand dollars ($75,000).

209.    Company 2's defamatory Statements have been either published either with knowledge of their falsity or with reckless disregard of their truth or falsity, thus warranting an award of punitive damages that will punish and deter it and others from like conduct.

WHEREFORE, Plaintiffs pray this Honorable Court makes and enters its Order and Judgment against Brass21 Productions, LLC for reputational and other damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Brass21 Productions, LLC's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### XV : Interference With a Present or Future
### Business Relationship Against Defendant Adam Brassfield
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action of Interference with a Business

Relationship against Defendant Adam Brassfield ("Brassfield") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

210.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

211.    At all times relevant to this action, Ben was the President of Victory.

212.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his employment through Victory, and that Victory derived its revenue through political consulting and campaign management services, which in turn relied upon clients' and prospective clients' faith and trust in Plaintiffs.

213.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his writing for various online publications, such as thegatewaypundit.com and tgpfactcheck.com, and that the success of this writing relied upon readers' faith and trust in Plaintiffs, which in turn affected readership and advertising revenue.

214.    At all times relevant to this action, Defendants knew or could have reasonably known that Ben derived income through his employment with the Michigan Legislature, and that this relied upon the Legislature's (and Matt Maddock's) faith and trust in Ben, as well as the faith and trust of Maddock's constituents.

215.    At all times relevant to this action, Defendants had knowledge that Plaintiffs rely upon their credibility and reputation for truthfulness, honesty, integrity, and excellence, and that by accusing Plaintiffs of fraud, embezzlement, being a felon, and the numerous false and defamatory Statements contained in paragraphs 17-20, *supra*, and **Exhibits 1 & 2** ("Statements"), Victory's reputation and brand would be damaged, Ben's personal and professional reputation would be damaged, and the result would be a reduction in clients, and a corresponding loss in

income.  These facts known to Defendants were sufficient, if followed by reasonable inquiry, to have led to a complete disclosure of contractual relations and rights of the Plaintiffs.

216.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

217.    In making their false and defamatory Statements, Defendants intentionally interfered with Plaintiffs' relationships with employers and prospective employers, online publications, clients and prospective clients, readers and prospective readers, advertisers and prospective advertisers, by making the statements, allegations, and imputations ("Misrepresentations of Fact") found in Defendants' false and defamatory Statements.  These Statements were unequivocally and provably false.

218.    Defendants' conduct was intentional, and they knew would be seen by Plaintiffs' readers, employers, advertisers, publications, and clients, and prospective readers, employers, advertisers, publications, and clients, would view the Misrepresentations of Fact and thereby reduce the frequency of readership, advertising and or patronage; cease reading, advertising, or transacting business altogether; terminate Plaintiffs' employment; or that it would discourage prospective readers, employers, publications, advertisers and clients from reading, advertising, and/or hiring/purchasing Plaintiffs, content and services.

219.    Specifically, Defendants' Misrepresentations of Fact were an improper means of seeking to further their own financial interests through luring away present and imminently

prospective clients from Plaintiffs to the direct financial benefit of Defendants; improperly furthering the interests of their employees and/or agents, their third party co-conspirator paymasters; and evidencing the complete absence of any justification for Defendants' conduct.

220.    Defendants' Misrepresentations of Fact were also improper and wrongful because they were defamatory.

221.    Defendants' Misrepresentations of Fact were also improper and wrongful because they were intended to harm Plaintiffs out of political motivation.  Defendants sought to hinder Plaintiffs' ability to operate and derive revenue.  Defendants were not justified in publishing their Statements.

222.    As a result of Defendants' conduct, Plaintiffs have lost or may shortly lose current and prospective readers, employment, advertisers, and clients, and Plaintiffs will continue to lose prospective readers, advertisers, and clients in the future upon reading and/or watching Defendants' Misrepresentations of Fact and defamatory Statements, allegations and imputations.

223.    But for Defendants' Statements, Plaintiffs would not have suffered damages, significant pecuniary harm, and other damages resulting from reduced readership, employment, client relationships, diminished credibility, and diminished sales in an amount in excess of $75,000.

224.    WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendants for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendants; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on

all issues so triable; the removal of all of Defendants' defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### XV : Interference With a Present or Future
### Business Relationship Against Defendant Veronica Brassfield
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action of Interference with a Business Relationship against Defendant Veronica Brassfield ("Brassfield") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

225.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

226.    At all times relevant to this action, Ben was the President of Victory.

227.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his employment through Victory, and that Victory derived its revenue through political consulting and campaign management services, which in turn relied upon clients' and prospective clients' faith and trust in Plaintiffs.

228.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his writing for various online publications, such as thegatewaypundit.com and tgpfactcheck.com, and that the success of this writing relied upon readers' faith and trust in Plaintiffs, which in turn affected readership and advertising revenue.

229.    At all times relevant to this action, Defendants knew or could have reasonably known that Ben derived income through his employment with the Michigan Legislature, and that

77

this relied upon the Legislature's (and Matt Maddock's) faith and trust in Ben, as well as the faith and trust of Maddock's constituents.

230.    At all times relevant to this action, Defendants had knowledge that Plaintiffs rely upon their credibility and reputation for truthfulness, honesty, integrity, and excellence, and that by accusing Plaintiffs of fraud, embezzlement, being a felon, and the numerous false and defamatory Statements contained in paragraphs 17-20, *supra*, and Exhibits 1 &2 ("Statements"), Victory's reputation and brand would be damaged, Ben's personal and professional reputation would be damaged, and the result would be a reduction in clients, and a corresponding loss in income.  These facts known to Defendants were sufficient, if followed by reasonable inquiry, to have led to a complete disclosure of contractual relations and rights of the Plaintiffs.

231.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

232.    In making their false and defamatory Statements, Defendants intentionally interfered with Plaintiffs' relationships with employers and prospective employers, online publications, clients and prospective clients, readers and prospective readers, advertisers and prospective advertisers, by making the statements, allegations, and imputations ("Misrepresentations of Fact") found in Defendants' false and defamatory Statements.  These Statements were unequivocally and provably false.

233.    Defendants' conduct was intentional, and they knew would be seen by Plaintiffs' readers, employers, advertisers, publications, and clients, and prospective readers, employers, advertisers, publications, and clients, would view the Misrepresentations of Fact and thereby reduce the frequency of readership, advertising and or patronage; cease reading, advertising, or transacting business altogether; terminate Plaintiffs' employment; or that it would discourage prospective readers, employers, publications, advertisers and clients from reading, advertising, and/or hiring/purchasing Plaintiffs, content and services.

234.    Specifically, Defendants' Misrepresentations of Fact were an improper means of seeking to further their own financial interests through luring away present and imminently prospective clients from Plaintiffs to the direct financial benefit of Defendants; improperly furthering the interests of their employees and/or agents, their third-party co-conspirator paymasters; and evidencing the complete absence of any justification for Defendants' conduct.

235.    Defendants' Misrepresentations of Fact were also improper and wrongful because they were defamatory.

236.    Defendants' Misrepresentations of Fact were also improper and wrongful because they were intended to harm Plaintiffs out of political motivation.  Defendants sought to hinder Plaintiffs' ability to operate and derive revenue.  Defendants were not justified in publishing their Statements.

237.    As a result of Defendants' conduct, Plaintiffs have lost or may shortly lose current and prospective readers, employment, advertisers, and clients, and Plaintiffs will continue to lose prospective readers, advertisers, and clients in the future upon reading and/or watching Defendants' Misrepresentations of Fact and defamatory Statements, allegations and imputations.

238.    But for Defendants' Statements, Plaintiffs would not have suffered damages, significant pecuniary harm, and other damages resulting from reduced readership, employment, client relationships, diminished credibility, and diminished sales in an amount in excess of $75,000.

239.    WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendants for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendants; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Defendants' defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

## XVII : Interference With a Present or Future
## Business Relationship Against Defendant Adam Brassfield, Inc.
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action of Interference with a Business Relationship against Defendant Adam Brassfield, Inc. ("Company 1") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

240.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

241.    At all times relevant to this action, Ben was the President of Victory.

242.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his employment through Victory, and that Victory derived its revenue through

political consulting and campaign management services, which in turn relied upon clients' and prospective clients' faith and trust in Plaintiffs.

243.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his writing for various online publications, such as thegatewaypundit.com and tgpfactcheck.com, and that the success of this writing relied upon readers' faith and trust in Plaintiffs, which in turn affected readership and advertising revenue.

244.    At all times relevant to this action, Defendants knew or could have reasonably known that Ben derived income through his employment with the Michigan Legislature, and that this relied upon the Legislature's (and Matt Maddock's) faith and trust in Ben, as well as the faith and trust of Maddock's constituents.

245.    At all times relevant to this action, Defendants had knowledge that Plaintiffs rely upon their credibility and reputation for truthfulness, honesty, integrity, and excellence, and that by accusing Plaintiffs of fraud, embezzlement, being a felon, and the numerous false and defamatory Statements contained in paragraphs 17-20, *supra*, and Exhibits 1 &2 ("Statements"), Victory's reputation and brand would be damaged, Ben's personal and professional reputation would be damaged, and the result would be a reduction in clients, and a corresponding loss in income.  These facts known to Defendants were sufficient, if followed by reasonable inquiry, to have led to a complete disclosure of contractual relations and rights of the Plaintiffs.

246.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical

services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

247.    In making their false and defamatory Statements, Defendants intentionally interfered with Plaintiffs' relationships with employers and prospective employers, online publications, clients and prospective clients, readers and prospective readers, advertisers and prospective advertisers, by making the statements, allegations, and imputations ("Misrepresentations of Fact") found in Defendants' false and defamatory Statements.  These Statements were unequivocally and provably false.

248.    Defendants' conduct was intentional, and they knew would be seen by Plaintiffs' readers, employers, advertisers, publications, and clients, and prospective readers, employers, advertisers, publications, and clients, would view the Misrepresentations of Fact and thereby reduce the frequency of readership, advertising and or patronage; cease reading, advertising, or transacting business altogether; terminate Plaintiffs' employment; or that it would discourage prospective readers, employers, publications, advertisers and clients from reading, advertising, and/or hiring/purchasing Plaintiffs, content and services.

249.    Specifically, Defendants' Misrepresentations of Fact were an improper means of seeking to further their own financial interests through luring away present and imminently prospective clients from Plaintiffs to the direct financial benefit of Defendants; improperly furthering the interests of their employees and/or agents, their third party co-conspirator paymasters; and evidencing the complete absence of any justification for Defendants' conduct.

250.    Defendants' Misrepresentations of Fact were also improper and wrongful because they were defamatory.

251.    Defendants' Misrepresentations of Fact were also improper and wrongful because they were intended to harm Plaintiffs out of political motivation.  Defendants sought to hinder Plaintiffs' ability to operate and derive revenue.  Defendants were not justified in publishing their Statements.

252.    As a result of Defendants' conduct, Plaintiffs have lost or may shortly lose current and prospective readers, employment, advertisers, and clients, and Plaintiffs will continue to lose prospective readers, advertisers, and clients in the future upon reading and/or watching Defendants' Misrepresentations of Fact and defamatory Statements, allegations and imputations.

253.    But for Defendants' Statements, Plaintiffs would not have suffered damages, significant pecuniary harm, and other damages resulting from reduced readership, employment, client relationships, diminished credibility, and diminished sales in an amount in excess of $75,000.

254.    WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendants for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendants; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Defendants' defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.


**XVIII : Interference With a Present or Future**
**Business Relationship Against Defendant Brass21 Productions, LLC.**
**(Plaintiffs Ben Wetmore and Victory Strategies, LLC)**

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action of Interference with a Business Relationship against Defendant Brass21 Productions, LLC ("Company 2") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

255.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

256.    At all times relevant to this action, Ben was the President of Victory.

257.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his employment through Victory, and that Victory derived its revenue through political consulting and campaign management services, which in turn relied upon clients' and prospective clients' faith and trust in Plaintiffs.

258.    At all times relevant to this action, Defendants had knowledge that Ben derived his income through his writing for various online publications, such as thegatewaypundit.com and tgpfactcheck.com, and that the success of this writing relied upon readers' faith and trust in Plaintiffs, which in turn affected readership and advertising revenue.

259.    At all times relevant to this action, Defendants knew or could have reasonably known that Ben derived income through his employment with the Michigan Legislature, and that this relied upon the Legislature's (and Matt Maddock's) faith and trust in Ben, as well as the faith and trust of Maddock's constituents.

260.    At all times relevant to this action, Defendants had knowledge that Plaintiffs rely upon their credibility and reputation for truthfulness, honesty, integrity, and excellence, and that by accusing Plaintiffs of fraud, embezzlement, being a felon, and the numerous false and defamatory Statements contained in paragraphs 17-20, *supra*, and **Exhibits 1 & 2** ("Statements"),

Victory's reputation and brand would be damaged, Ben's personal and professional reputation would be damaged, and the result would be a reduction in clients, and a corresponding loss in income.  These facts known to Defendants were sufficient, if followed by reasonable inquiry, to have led to a complete disclosure of contractual relations and rights of the Plaintiffs.

261.    Part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

262.    In making their false and defamatory Statements, Defendants intentionally interfered with Plaintiffs' relationships with employers and prospective employers, online publications, clients and prospective clients, readers and prospective readers, advertisers and prospective advertisers, by making the statements, allegations, and imputations ("Misrepresentations of Fact") found in Defendants' false and defamatory Statements.  These Statements were unequivocally and provably false.

263.    Defendants' conduct was intentional, and they knew would be seen by Plaintiffs' readers, employers, advertisers, publications, and clients, and prospective readers, employers, advertisers, publications, and clients, would view the Misrepresentations of Fact and thereby reduce the frequency of readership, advertising and or patronage; cease reading, advertising, or transacting business altogether; terminate Plaintiffs' employment; or that it would discourage prospective readers, employers, publications, advertisers and clients from reading, advertising, and/or hiring/purchasing Plaintiffs, content and services.

264.     Specifically, Defendants' Misrepresentations of Fact were an improper means of seeking to further their own financial interests through luring away present and imminently prospective clients from Plaintiffs to the direct financial benefit of Defendants; improperly furthering the interests of their employees and/or agents, their third party co-conspirator paymasters; and evidencing the complete absence of any justification for Defendants' conduct.

265.     Defendants' Misrepresentations of Fact were also improper and wrongful because they were defamatory.

266.     Defendants' Misrepresentations of Fact were also improper and wrongful because they were intended to harm Plaintiffs out of political motivation.  Defendants sought to hinder Plaintiffs' ability to operate and derive revenue.  Defendants were not justified in publishing their Statements.

267.     As a result of Defendants' conduct, Plaintiffs have lost or may shortly lose current and prospective readers, employment, advertisers, and clients, and Plaintiffs will continue to lose prospective readers, advertisers, and clients in the future upon reading and/or watching Defendants' Misrepresentations of Fact and defamatory Statements, allegations and imputations.

268.     But for Defendants' Statements, Plaintiffs would not have suffered damages, significant pecuniary harm, and other damages resulting from reduced readership, employment, client relationships, diminished credibility, and diminished sales in an amount in excess of $75,000.

WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Brass21 Productions, LLC for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed

to Defendants; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the removal of all of Defendants' defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### XXII : Violation of the Lanham Act (Unfair Competition/ False Advertising) Against Defendant Adam Brassfield (Plaintiffs Ben Wetmore Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action for Lanham Act (15 U.S.C. § 1125(a)(1)(B) violations (false advertising) against Defendant Adam Brassfield ("Brassfield") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

269.    Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

270.    At all relevant times, Defendants have been and continue to be **direct competitors** with Plaintiffs, in that all parties offer political consulting services to political candidates in the State of Michigan ("Michigan Market").

271.    Prior to the 2021-2022 election cycle, Defendants had not entered into the State of Michigan to market their services to prospective clients.

272.    Beginning in 2021, Defendants sought to enter the Michigan Market and gain clients through misrepresenting the quality and integrity of Plaintiffs' services.

273.    To accomplish this, Defendants collaborated with each other and with third-party individuals and entities to develop a commercial advertising campaign that would be disseminated to large portions of the public in the Michigan Market through social media and through the

amplification of other political media personalities, including but not limited to Jovan Hutton Pulitzer.

274.    The purpose of this **commercial advertising campaign** ("Ad Campaign") was to penetrate the Michigan Market and influence political candidate customers to purchase Defendants' services.

275.    Defendants' Ad Campaign, being primarily published on social media, the Ads were disseminated out into the furthest reaches of the internet, and the Ads were received by customers throughout the United States, including, but not limited to, Texas, Michigan, Missouri, Arkansas, and other locations.

276.    Defendants' Ad Campaign consisted and continues to consist of a combination of social media posts on Twitter and Facebook, among other mediums, as well as live video infomercial broadcasts on Facebook.

277.    The primary purpose of this Ad Campaign is to **materially deceive** Michigan Market customers about the nature, quality, characteristics, and integrity of competitor Plaintiffs' political consulting services through the use of false and misleading statements ("Statements") (*see* paragraphs 17-20, *supra*, and **Exhibits 1 & 2**), including but not limited to blatant falsehoods, innuendo, indirect intimations, and ambiguous suggestions, in order to influence Plaintiff's customers and other customers to terminate their relationships with Plaintiffs and/or to instead purchase Defendants' services, and to poison the perception of Plaintiffs services in the Michigan Market and in all other markets: Defendants' material deception of customers has been so widespread and unceasing, it will likely prevent Plaintiffs from expanding into other markets adjoining the Michigan Market, and it has caused and will continue to cause Plaintiffs to lose the goodwill associated with its services in all other markets.

278.    The Ad Campaign Statements are self-evidently **material**, because Statements regarding, *inter alia*, a political consultant's: criminal history, propensity to break the law, propensity to risk ensnaring his clients in criminal or unethical intrigues, alleged status as an actual felon, engaging in bribery, stealing from donors, embezzling funds from non-profits, stealing from candidates, and mismanaging candidate accounts, *are self-evidently material to a political candidate's decision whether to hire a political consultant*.

279.    Because the Ad Campaign was published on social media, and because the publications have not been removed, and because it is extremely difficult to remove all instantiations of the publications (including on internet archive platforms) from the internet, the Ad Campaign will, without a court-ordered injunction, appear in Google and other search engine searches for Plaintiffs for the foreseeable future.  Accordingly, not only have Defendants caused their false and misleading statements to immediately enter interstate commerce, but Defendants' false and misleading Statements will continue to enter interstate commerce and harming Plaintiffs in any and every market they have entered or will enter.

280.    Defendants' Statements were either *literally* false or *impliedly* false and therefore misleading as more fully described in Paragraphs 17-20, *supra*.

281.    In the alternative, if the Statements were not *literally* false, then they were, at a minimum, *impliedly* false and misleading.

282.    Defendants' Ad Campaign (which continues to date) injured Plaintiffs and is highly likely to continue to harm Plaintiffs.  The Ad Campaign has the capacity to deceive *and indeed has deceived customers*; to date it has influenced scores of customers' – at least twenty (20), and possibly more than forty (40) purchasing decisions already, and it is likely to do so in the future as well.

283.    Thus, Plaintiffs have been harmed and are likely to harmed in the future, both by direct diversion of sales from themselves to Defendants, and/or by a loss of goodwill associated with Plaintiffs' services.

284.    Further, part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

285.    Plaintiffs demand that Defendants be enjoined from making any further statement consistent with or in any way similar to the Statements discussed at length, here, relating to and/or regarding Plaintiffs, their clients, their employers, and/or their supervisors, that such injunction further compel Defendants to remove all of their Statements from the internet and provide them with a court order which they are to then serve with personal service upon Twitter, Facebook, and other internet platforms upon which their publications were made, compelling Defendants to publish, on Twitter, Facebook, and every platform upon which they published their Statements, a total retraction and apology, and further compelling Defendants to issue a press release to every newspaper in the states of Michigan, Texas, Missouri, South Dakota, and Washington, D.C., consisting of a total retraction of their Statements as well as an apology to Plaintiffs.

WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendant Adam Brassfield for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed

to Defendant Adam Brassfield; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the grant of preliminary and permanent injunctive relief consistent with the paragraph immediately preceding the instant paragraph, as well as the removal of all of Defendant Adam Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### XXIV : Violation of the Lanham Act (Unfair Competition/ False Advertising), Against Defendant Veronica Brassfield
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action for Lanham Act (15 U.S.C. § 1125(a)(1)(B) violations (false advertising) against Defendant Veronica Brassfield ("Brassfield") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

286.     Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

287.     At all relevant times, Defendants have been and continue to be **direct competitors** with Plaintiffs, in that all parties offer political consulting services to political candidates in the State of Michigan ("Michigan Market").

288.     Prior to the 2021-2022 election cycle, Defendants had not entered into the State of Michigan to market their services to prospective clients.

289.     Beginning in 2021, Defendants sought to enter the Michigan Market and gain clients through misrepresenting the quality and integrity of Plaintiffs' services.

290.   To accomplish this, Defendants collaborated with each other and with third-party individuals and entities to develop a commercial advertising campaign that would be disseminated to large portions of the public in the Michigan Market through social media and through the amplification of other political media personalities, including but not limited to Jovan Hutton Pulitzer.

291.   The purpose of this **commercial advertising campaign** ("Ad Campaign") was to penetrate the Michigan Market and influence political candidate customers to purchase Defendants' services.

292.   Defendants' Ad Campaign, being primarily published on social media, the Ads were disseminated out into the furthest reaches of the internet, and the Ads were received by customers throughout the United States, including, but not limited to, Texas, Michigan, Missouri, Arkansas, and other locations.

293.   Defendants' Ad Campaign consisted and continues to consist of a combination of social media posts on Twitter and Facebook, among other mediums, as well as live video infomercial broadcasts on Facebook.

294.   The primary purpose of this Ad Campaign is to **materially deceive** Michigan Market customers about the nature, quality, characteristics, and integrity of competitor Plaintiffs' political consulting services through the use of false and misleading statements ("Statements") (*see* paragraphs 17-20, *supra*, and **Exhibits 1 & 2**), including but not limited to blatant falsehoods, innuendo, indirect intimations, and ambiguous suggestions, in order to influence Plaintiff's customers and other customers to terminate their relationships with Plaintiffs and/or to instead purchase Defendants' services, and to poison the perception of Plaintiffs services in the Michigan Market and in all other markets: Defendants' material deception of customers has been so

widespread and unceasing, it will likely prevent Plaintiffs from expanding into other markets adjoining the Michigan Market, and it has caused and will continue to cause Plaintiffs to lose the goodwill associated with its services in all other markets.

295.    The Ad Campaign Statements are self-evidently **material**, because Statements regarding, *inter alia*, a political consultant's: criminal history, propensity to break the law, propensity to risk ensnaring his clients in criminal or unethical intrigues, alleged status as an actual felon, engaging in bribery, stealing from donors, embezzling funds from non-profits, stealing from candidates, and mismanaging candidate accounts, *are self-evidently material to a political candidate's decision whether to hire a political consultant*.

296.    Because the Ad Campaign was published on social media, and because the publications have not been removed, and because it is extremely difficult to remove all instantiations of the publications (including on internet archive platforms) from the internet, the Ad Campaign will, without a court-ordered injunction, appear in Google and other search engine searches for Plaintiffs for the foreseeable future.  Accordingly, not only have Defendants caused their false and misleading statements to immediately enter interstate commerce, but Defendants' false and misleading Statements will continue to enter interstate commerce and harming Plaintiffs in any and every market they have entered or will enter.

297.    Defendants' Statements were either *literally* false or *impliedly* false and therefore misleading as more fully described in Paragraphs 17-20, *supra*.

298.    In the alternative, if the Statements were not *literally* false, then they were, at a minimum, *impliedly* false and misleading.

299.    Defendants' Ad Campaign (which continues to date) injured Plaintiffs and is highly likely to continue to harm Plaintiffs.  The Ad Campaign has the capacity to deceive *and indeed*

*has deceived customers*; to date it has influenced scores of customers' – at least twenty (20), and possibly more than forty (40) purchasing decisions already, and it is likely to do so in the future as well.

300. Thus, Plaintiffs have been harmed and are likely to harmed in the future, both by direct diversion of sales from themselves to Defendants, and/or by a loss of goodwill associated with Plaintiffs' services.

301. Further, part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising. As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors. These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

302. Plaintiffs demand that Defendants be enjoined from making any further statement consistent with or in any way similar to the Statements discussed at length, here, relating to and/or regarding Plaintiffs, their clients, their employers, and/or their supervisors, that such injunction further compel Defendants to remove all of their Statements from the internet and provide them with a court order which they are to then serve with personal service upon Twitter, Facebook, and other internet platforms upon which their publications were made, compelling Defendants to publish, on Twitter, Facebook, and every platform upon which they published their Statements, a total retraction and apology, and further compelling Defendants to issue a press release to every newspaper in the states of Michigan, Texas, Missouri, South Dakota, and Washington, D.C., consisting of a total retraction of their Statements as well as an apology to Plaintiffs.

WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendant Veronica Brassfield for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant Veronica Brassfield; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the grant of preliminary and permanent injunctive relief consistent with the paragraph immediately preceding the instant paragraph, as well as the removal of all of Defendant Veronica Brassfield's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### XXV : Violation of the Lanham Act (Unfair Competition/ False Advertising) Against Defendant Adam Brassfield, Inc.
**(Plaintiffs Ben Wetmore and Victory Strategies, LLC)**

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action for Lanham Act (15 U.S.C. § 1125(a)(1)(B) violations (false advertising) against Defendant Adam Brassfield, Inc. ("Company 1") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

303.     Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

304.     At all relevant times, Defendants have been and continue to be **direct competitors** with Plaintiffs, in that all parties offer political consulting services to political candidates in the State of Michigan ("Michigan Market").

305.     Prior to the 2021-2022 election cycle, Defendants had not entered into the State of Michigan to market their services to prospective clients.

95

306.    Beginning in 2021, Defendants sought to enter the Michigan Market and gain clients through misrepresenting the quality and integrity of Plaintiffs' services.

307.    To accomplish this, Defendants collaborated with each other and with third-party individuals and entities to develop a commercial advertising campaign that would be disseminated to large portions of the public in the Michigan Market through social media and through the amplification of other political media personalities, including but not limited to Jovan Hutton Pulitzer.

308.    The purpose of this **commercial advertising campaign** ("Ad Campaign") was to penetrate the Michigan Market and influence political candidate customers to purchase Defendants' services.

309.    Defendants' Ad Campaign, being primarily published on social media, the Ads were disseminated out into the furthest reaches of the internet, and the Ads were received by customers throughout the United States, including, but not limited to, Texas, Michigan, Missouri, Arkansas, and other locations.

310.    Defendants' Ad Campaign consisted and continues to consist of a combination of social media posts on Twitter and Facebook, among other mediums, as well as live video infomercial broadcasts on Facebook.

311.    The primary purpose of this Ad Campaign is to **materially deceive** Michigan Market customers about the nature, quality, characteristics, and integrity of competitor Plaintiffs' political consulting services through the use of false and misleading statements ("Statements") (*see* paragraphs 17-20, *supra*, and **Exhibits 1 & 2**), including but not limited to blatant falsehoods, innuendo, indirect intimations, and ambiguous suggestions, in order to influence Plaintiff's customers and other customers to terminate their relationships with Plaintiffs and/or to instead

purchase Defendants' services, and to poison the perception of Plaintiffs services in the Michigan Market and in all other markets: Defendants' material deception of customers has been so widespread and unceasing, it will likely prevent Plaintiffs from expanding into other markets adjoining the Michigan Market, and it has caused and will continue to cause Plaintiffs to lose the goodwill associated with its services in all other markets.

312.   The Ad Campaign Statements are self-evidently **material**, because Statements regarding, *inter alia*, a political consultant's: criminal history, propensity to break the law, propensity to risk ensnaring his clients in criminal or unethical intrigues, alleged status as an actual felon, engaging in bribery, stealing from donors, embezzling funds from non-profits, stealing from candidates, and mismanaging candidate accounts, *are self-evidently material to a political candidate's decision whether to hire a political consultant*.

313.   Because the Ad Campaign was published on social media, and because the publications have not been removed, and because it is extremely difficult to remove all instantiations of the publications (including on internet archive platforms) from the internet, the Ad Campaign will, without a court-ordered injunction, appear in Google and other search engine searches for Plaintiffs for the foreseeable future.  Accordingly, not only have Defendants caused their false and misleading statements to immediately enter interstate commerce, but Defendants' false and misleading Statements will continue to enter interstate commerce and harming Plaintiffs in any and every market they have entered or will enter.

314.   Defendants' Statements were either *literally* false or *impliedly* false and therefore misleading as more fully described in Paragraphs 17-20, *supra*.

315.   In the alternative, if the Statements were not *literally* false, then they were, at a minimum, *impliedly* false and misleading.

316.     Defendants' Ad Campaign (which continues to date) injured Plaintiffs and is highly likely to continue to harm Plaintiffs.  The Ad Campaign has the capacity to deceive *and indeed has deceived customers*; to date it has influenced scores of customers' – at least twenty (20), and possibly more than forty (40) purchasing decisions already, and it is likely to do so in the future as well.

317.     Thus, Plaintiffs have been harmed and are likely to harmed in the future, both by direct diversion of sales from themselves to Defendants, and/or by a loss of goodwill associated with Plaintiffs' services.

318.     Further, part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

319.     Plaintiffs demand that Defendants be enjoined from making any further statement consistent with or in any way similar to the Statements discussed at length, here, relating to and/or regarding Plaintiffs, their clients, their employers, and/or their supervisors, that such injunction further compel Defendants to remove all of their Statements from the internet and provide them with a court order which they are to then serve with personal service upon Twitter, Facebook, and other internet platforms upon which their publications were made, compelling Defendants to publish, on Twitter, Facebook, and every platform upon which they published their Statements, a total retraction and apology, and further compelling Defendants to issue a press release to every

newspaper in the states of Michigan, Texas, Missouri, South Dakota, and Washington, D.C., consisting of a total retraction of their Statements as well as an apology to Plaintiffs.

WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendant Adam Brassfield, Inc. for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant Adam Brassfield, Inc.; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the grant of preliminary and permanent injunctive relief consistent with the paragraph immediately preceding the instant paragraph, as well as the removal of all of Defendant Adam Brassfield Inc.'s defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

### XXVII : Violation of the Lanham Act (Unfair Competition/ False Advertising) Against Defendant Brass21 Productions, LLC
### (Plaintiffs Ben Wetmore and Victory Strategies, LLC)

COME NOW Plaintiffs Ben Wetmore ("Ben" or "Wetmore") and Victory Strategies, LLC ("Victory") (collectively, "Plaintiffs") and for their causes of action for Lanham Act (15 U.S.C. § 1125(a)(1)(B) violations (false advertising) against Defendant Brass21 Productions, LLC ("Company 2") (or, collectively with the other defendants, "Defendants"), state to the Court as follows:

320.   Plaintiffs incorporate by reference all allegations in all preceding and following paragraphs, as though fully restated and set-forth herein.

321.     At all relevant times, Defendants have been and continue to be **direct competitors** with Plaintiffs, in that all parties offer political consulting services to political candidates in the State of Michigan ("Michigan Market").

322.     Prior to the 2021-2022 election cycle, Defendants had not entered into the State of Michigan to market their services to prospective clients.

323.     Beginning in 2021, Defendants sought to enter the Michigan Market and gain clients through misrepresenting the quality and integrity of Plaintiffs' services.

324.     To accomplish this, Defendants collaborated with each other and with third-party individuals and entities to develop a commercial advertising campaign that would be disseminated to large portions of the public in the Michigan Market through social media and through the amplification of other political media personalities, including but not limited to Jovan Hutton Pulitzer.

325.     The purpose of this **commercial advertising campaign** ("Ad Campaign") was to penetrate the Michigan Market and influence political candidate customers to purchase Defendants' services.

326.     Defendants' Ad Campaign, being primarily published on social media, the Ads were disseminated out into the furthest reaches of the internet, and the Ads were received by customers throughout the United States, including, but not limited to, Texas, Michigan, Missouri, Arkansas, and other locations.

327.     Defendants' Ad Campaign consisted and continues to consist of a combination of social media posts on Twitter and Facebook, among other mediums, as well as live video infomercial broadcasts on Facebook.

328.    The primary purpose of this Ad Campaign is to **materially deceive** Michigan Market customers about the nature, quality, characteristics, and integrity of competitor Plaintiffs' political consulting services through the use of false and misleading statements ("Statements") (*see* paragraphs 17-20, *supra*, and **Exhibits 1 & 2**), including but not limited to blatant falsehoods, innuendo, indirect intimations, and ambiguous suggestions, in order to influence Plaintiff's customers and other customers to terminate their relationships with Plaintiffs and/or to instead purchase Defendants' services, and to poison the perception of Plaintiffs services in the Michigan Market and in all other markets: Defendants' material deception of customers has been so widespread and unceasing, it will likely prevent Plaintiffs from expanding into other markets adjoining the Michigan Market, and it has caused and will continue to cause Plaintiffs to lose the goodwill associated with its services in all other markets.

329.    The Ad Campaign Statements are self-evidently **material**, because Statements regarding, *inter alia*, a political consultant's: criminal history, propensity to break the law, propensity to risk ensnaring his clients in criminal or unethical intrigues, alleged status as an actual felon, engaging in bribery, stealing from donors, embezzling funds from non-profits, stealing from candidates, and mismanaging candidate accounts, *are self-evidently material to a political candidate's decision whether to hire a political consultant*.

330.    Because the Ad Campaign was published on social media, and because the publications have not been removed, and because it is extremely difficult to remove all instantiations of the publications (including on internet archive platforms) from the internet, the Ad Campaign will, without a court-ordered injunction, appear in Google and other search engine searches for Plaintiffs for the foreseeable future.  Accordingly, not only have Defendants caused their false and misleading statements to immediately enter interstate commerce, but Defendants'

false and misleading Statements will continue to enter interstate commerce and harming Plaintiffs in any and every market they have entered or will enter.

331.    Defendants' Statements were either *literally* false or *impliedly* false and therefore misleading as more fully described in Paragraphs 17-20, *supra*.

332.    In the alternative, if the Statements were not *literally* false, then they were, at a minimum, *impliedly* false and misleading.

333.    Defendants' Ad Campaign (which continues to date) injured Plaintiffs and is highly likely to continue to harm Plaintiffs.  The Ad Campaign has the capacity to deceive *and indeed has deceived customers*; to date it has influenced scores of customers' – at least twenty (20), and possibly more than forty (40) purchasing decisions already, and it is likely to do so in the future as well.

334.    Thus, Plaintiffs have been harmed and are likely to harmed in the future, both by direct diversion of sales from themselves to Defendants, and/or by a loss of goodwill associated with Plaintiffs' services.

335.    Further, part of Plaintiffs' services to clients is to advise them on all aspects of political donations and donors, and in some cases to assist in fundraising.  As discussed more fully, *supra*, in their Ad Campaign Defendants have also falsely stated that Plaintiffs have stolen donations and misled political donors.  These statements have damaged Plaintiffs' ability to provide critical services to their customers, likely resulting in a loss of customers, and this damage is likely to continue in the future.

336.    Plaintiffs demand that Defendants be enjoined from making any further statement consistent with or in any way similar to the Statements discussed at length, here, relating to and/or regarding Plaintiffs, their clients, their employers, and/or their supervisors, that such injunction

further compel Defendants to remove all of their Statements from the internet and provide them with a court order which they are to then serve with personal service upon Twitter, Facebook, and other internet platforms upon which their publications were made, compelling Defendants to publish, on Twitter, Facebook, and every platform upon which they published their Statements, a total retraction and apology, and further compelling Defendants to issue a press release to every newspaper in the states of Michigan, Texas, Missouri, South Dakota, and Washington, D.C., consisting of a total retraction of their Statements as well as an apology to Plaintiffs.

WHEREFORE, Plaintiffs pray this Honorable Court make and enter its Order and Judgment against Defendant Brass21 Productions, LLC for reputational damages, business losses and branding damages in such sum in excess of $75,000.00 as is fair, reasonable, and certain, to be determined at trial; punitive damages in an amount to be determined at trial; that all costs be taxed to Defendant Brass21 Productions, LLC; pre and post-judgment interest; that Plaintiffs recover their reasonable attorney's fees; trial by jury on all issues so triable; the grant of preliminary and permanent injunctive relief consistent with the paragraph immediately preceding the instant paragraph, as well as the removal of all of Defendant Brass21 Productions, LLC's defamatory content regarding Plaintiffs from the internet, and for such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

COME NOW Plaintiffs Ben Wetmore and Victory Strategies, LLC to demand trial by jury on all causes of action contained herein.

Respectfully submitted,
BURNS LAW FIRM

*/s/ John C. Burns*
JOHN C. BURNS, MBE #66462
P.O. Box 191250
St. Louis, Missouri 63119
Tel:  (314) 329-5040
Fax:  (314) 282-8136
Email: tblf@pm.me
*Attorney for Plaintiffs*